# No. 24-631

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**JORGE FELIX IBARRA-PEREZ,**

**Plaintiff-Appellant,**

v.

**UNITED STATES OF AMERICA,**

**Defendant-Appellee.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
No. CV-22-01100-PHX-DWL (CDB)

**PETITION FOR EN BANC REHEARING**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIMOTHY COURCHAINE
United States Attorney

MELISSA NEIMAN-KELTING
BRYAN S. BEIER
Attorneys, Office of Immigration Litigation
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

INTRODUCTION ........................................................... 1

BACKGROUND ........................................................... 2

ARGUMENT ............................................................... 5

Rehearing En Banc Is Warranted To Resolve Whether
Section 1252(g) Forecloses Collateral Challenges to the
Execution of Removal Orders ........................................ 5

    A.    The Panel Decision Creates Both Intra- and
            Inter-Circuit Conflicts ...................................... 6

    B.    The Panel Decision Is Wrong ..................................... 12

CONCLUSION ............................................................ 19

Appendix: *Ibarra-Perez v. United States*, 154 F.4th 989 (9th Cir. 2025)

Proof of Compliance

# TABLE OF AUTHORITIES

## Cases

*Ali v. Ashcroft,*
  346 F.3d 873, 878 (9th Cir. 2003)............................................................ 14

*Ali v. Gonzales,*
  421 F.3d 795 (9th Cir. 2005) (amended opinion) .................................... 15

*Arce v. United States,*
  899 F.3d 796 (9th Cir. 2018)...................................................................... 3

*Camarena v. Dir.,ICE,*
  988 F.3d 1268 (11th Cir. 2021)........................................................... 8, 11

*Cheng Fan Kwok v. INS,*
  392 U.S. 206 (1968) ................................................................................ 14

*E.F.L. v. Prim,*
  986 F.3d 959 (7th. Cir. 2021)...................................................... 8, 10, 11

*Jimenez-Angeles v. Ashcroft,*
  291 F.3d 594 (9th Cir. 2002)...................................................................... 7

*Johnson v. Guzman Chavez,*
  594 U.S. 523 (2021) ................................................................................ 16

*Kucana v. Holder,*
  558 U.S. 233 (2010) ................................................................................ 14

*Mapoy v. Carroll,*
  185 F.3d 224 (4th Cir. 1999).................................................................... 12

*Mata v. Lynch,*
  576 U.S. 143 (2015) ................................................................................ 18

*Nasrallah v. Barr,*
  590 U.S. 573 (2020) ................................................................................ 17

*Rauda v. Jennings*,
  55 F.4th 773 (9th Cir. 2022) (amended opinion) ........................... 1, passim

*Reno v. American-Arab Anti-Discrimination Committee*,
  525 U.S. 471 (1999) ............................................................... 1, 13

*Riley v. Bondi*,
  606 U.S. 259 (2025) ................................................................. 14

*Stone v. INS*,
  514 U.S. 386 (1995) ................................................................. 14

*Tazu v. Att'y Gen.*,
  975 F.3d 292 (3d Cir. 2020) ........................................... 2, 11, 12

*Toor v. Lynch*,
  789 F.3d 1055 (9th Cir. 2015) ................................................. 18

*United States v. Hovespian*,
  359 F.3d 1144 (9th Cir. 2004) (en banc) ................................ 4, 14

*Wheeler v. ICE*,
  No. CV-25-103-GF-BMM, 2026 WL 74161 (D. Mont. Jan. 9, 2026) ....... 9

## Statutes

8 U.S.C. § 1101(a)(47)(A) ............................................................ 17

8 U.S.C. § 1229a(c)(1)(A) ............................................................ 16

8 U.S.C. § 1229a(c)(6)-(7) ........................................................... 18

8 U.S.C. § 1231(b)-(d) ................................................................ 16

REAL ID Act of 2005,
  Pub. L. 109-13, Div. B, Title I, § 106(a) (May 11, 2005) ........................ 15

## Other Authorities

*Merriam Webster's Dictionary of Law* (1996) ............................... 14

Rules

Fed. R. App. P. 40(b)(2) .............................................................. 2, 5

Regulations

8 C.F.R. § 1240.12(d) ................................................................ 16

## INTRODUCTION

In Section 1252(g), Title 8, Congress implemented its "clear[] design[]" to prevent "separate rounds of judicial intervention" into immigration enforcement decisions "outside the streamlined process" it prescribed in the Immigration and Nationality Act. *Reno v. American-Arab Anti-Discrimination Committee* (*AADC*), 525 U.S. 471, 485 (1999). By ruling that Plaintiff-Appellant Ibarra-Perez's tort claims against the United States may proceed under the Federal Tort Claims Act, *see* 154 F.4th 989 (9th Cir. 2025) ("Op."), the divided panel rendered a judgment that is contrary to that plain text and conflicts with numerous judicial decisions, including *Rauda v. Jennings*, 55 F.4th 773 (9th Cir. 2022) (amended opinion). En banc review is warranted to resolve that conflict and avoid unnecessary confusion as to the proper scope of this critical immigration provision.

Indeed, the majority's decision is already causing confusion in the district courts regarding the application of Section 1252(g) in light of this Court's now cross-cutting precedent. And left uncorrected, as Judge Nelson pointed out in dissent, the application of the majority's "atextual exception to the statute's otherwise clear scope" ultimately "'would gut'" Section 1252(g), thwarting Congress's clear design and replicating the very sort of

error that has already been "corrected before" – "three" times. Op. at 1005-06, 1010 (R. Nelson, J., dissenting) (quoting *Tazu v. Att'y Gen.*, 975 F.3d 292, 298 (3d Cir. 2020)). If the majority does not correct its error, the en banc Court should step in to do so, resolve the conflicts, and ensure the proper and uniform application of § 1252(g) within this Circuit. *See* Fed. R. App. P 40(b)(2)(A)-(C).

## BACKGROUND

Section 1252(g) provides: "Except as provided in this section and notwithstanding any other provision of law … no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." This case concerns a tort suit by an alien seeking compensation under Arizona law for damages he alleges he suffered "as a result of" the execution of his removal order by law enforcement agents of Immigration and Customs Enforcement. Op. at 994. Ibarra-Perez was removed to Mexico pursuant to a valid removal order after he was ordered removed and granted withholding of removal to Cuba, where he had been persecuted. *Id.* at 992-93. He alleged that the tort of false imprisonment was committed when "the government wrongfully deprived his liberty by

'physically deporting him' to Mexico"; abuse of process was committed when "the government 'deported him to a country without lawful notice'"; ICE officers "intentionally inflicted emotional distress when they deported him to a country where they knew he'd be harmed"; and negligence occurred when "the government breached a duty 'not to cause harm or injury' when it physically deported him." Op. at 1003 (R. Nelson, J., dissenting).

The district court correctly held that Section 1252(g) stripped it of jurisdiction over such a claim. Recognizing that the complaint "advanced an array of theories as to why the ICE agents should not have executed the removal order," the court concluded that those "theories fundamentally relate to the actions of the ICE agents . . . in *executing a removal order*," and that Section 1252(g) "bars such claims." *See* Order at 9 (Jan. 19, 2024) (emphasis by the court). The district court also explained that result by referring to the ruling in *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018), that Section 1252(g) does not bar a tort claim for damages stemming from the execution of a removal order in violation of a judicial stay, pointing out that the *Arce* Court had reasoned that, "but for the stay of removal," the alien "would not have an FTCA claim at all," and explaining that, because Ibarra-Perez's removal order "had not been stayed (or otherwise invalidated) at the

– 3 –

time it was executed," he "cannot assert an FTCA claim premised on the . . . execution of the order." *Id.* at 9-10.

On appeal, a divided panel reversed. Op. at 1001. As relevant here, the majority ruled that, despite Section 1252(g), courts retain "jurisdiction to decide a 'purely legal question' that 'does not challenge the [agency's] discretionary authority.'" *Id.* at 996 (quoting *United States v. Hovespian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc)). The majority determined that Ibarra-Perez "raises purely legal arguments in challenging his removal," and "does not challenge ICE's discretionary authority to decide 'when' or 'whether' to execute a removal order." *Id.* at 997. The majority also concluded that Ibarra-Perez did not "challenge the 'execution' of his removal order" under Section 1252(g) because he was removed to Mexico and "Mexico was not mentioned in the order of removal." Op. at 997.

Judge Nelson dissented. He explained that the majority's carveout for "legal questions" had no basis in the text of Section 1252(g) – which covers "any" claim "arising from" the "execut[ion] [of] removal orders" – and ran afoul of the Supreme Court's precedent interpreting that plain text. Op. at 1004-05. And he explained that the majority's approach also conflicted with not only this Court's decision in *Rauda*, but also numerous decisions from "sister circuits" that have afforded Section 1252(g) its natural reading. *Id.* at

– 4 –

1005 (collecting cases from Third, Seventh, Eighth, and Eleventh Circuits).
Judge Nelson also explained, that properly read, Section 1252(g)
inescapably forecloses Ibarra-Perez's claim: "After all, Ibarra-Perez must be
challenging *something* – and here the only plausible answer is a challenge to
the execution of the order of removal entered against him." *Id.* at 1011; *see
also id.* at 1004 (if claim "that the government wrongfully executed his
removal order" is not "a challenge to the 'decision or action' to execute
removal orders, what is?").

## ARGUMENT

### Rehearing En Banc Is Warranted To Resolve Whether Section 1252(g) Forecloses Collateral Challenges to the Execution of Removal Orders

En banc rehearing is warranted when a panel decision "conflicts with
a decision of the court to which the petition is addressed . . . and the full
court's consideration is therefore necessary to secure or maintain uniformity
of the court's decisions," Fed. R. App. P. 40(b)(2)(A), as well as when the
decision conflicts with precedents of sister circuits. *See* Fed. R. App. P.
40(b)(2)(B)-(C). That is this case: The panel decision conflicts with Supreme
Court and Ninth Circuit precedent, as well as the precedent of a majority of
circuit courts to have reached this issue. And perhaps unsurprising given its
outlier status, the panel decision is wrong: It is fundamentally irreconcilable

– 5 –

with the text of Section 1252(g), as Judge Nelson explained thoroughly in dissent.

**A.    The Panel Decision Creates Both Intra- and Inter-Circuit Conflicts.**

**1. *The decision conflicts with Rauda v. Jennings.*** The panel majority's ruling that courts retain jurisdiction despite Section 1252(g) "to decide a 'purely legal question' that 'does not challenge the [agency's] discretionary authority,'" Op. at 996 (quoting *Hovespian*, 359 F.3d at 1155), clearly conflicts with *Rauda v. Jennings*, 55 F.4th 773 (9th Cir. 2022) (amended opinion). *Rauda* held that Section 1252(g) strips jurisdiction over an alien's claim that seeks to "enjoin 'action by the Attorney General to . . . execute removal orders against'" him. 55 F.4th at 777 (quoting § 1252(g)). Summing up its jurisdictional analysis, the *Rauda* Court explained that "[n]o matter how [petitioner] frames it, his challenge," *i.e.*., his seeking a court order enjoining his removal, "is to the Attorney General's exercise of his discretion to execute [the] removal order, which we have no jurisdiction to review." *Id.* at 778. In other words, the *Rauda* Court recognized that Section 1252(g) stripped jurisdiction to hear the *entirety* of a challenge to the execution of a removal order, including any legal questions embedded therein.

Although acknowledging *Rauda*'s holding that Section 1252(g) strips jurisdiction over challenges to "'when or 'whether' to execute a removal order," Op. at 997, the majority attempted to limit *Rauda* in two ways, neither of which is valid. Its starting point is that *Rauda* "made no new law," but "fits easily into a long series of decisions . . . holding that discretionary decisions are shielded from review." Op. at 999. It also sought to limit *Rauda*'s holding to a subset of the challenges that could be made to the execution of a removal order – decisions or actions regarding "'when' or 'whether' to execute a removal order." *See* Op. at 997 (citing *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir. 2002), and *Rauda*, *supra*).

But *Rauda*'s judgment is based on the text of Section 1252(g), concluding that its "plain language . . . bars review," 55 F.4th at 777. When the Court rejected the alien's contention that his claims were not barred by Section 1252(g), it did so by referring to the statutory text. Addressing the alien's attempt to characterize his claim as challenging "the Attorney General's allegedly unlawful decision to remove him *now*," not "the Attorney General's discretionary authority," for example, the Court pointed out that Section 1252(d) "does not include any temporal caveats." 55 F.4th at 778 (cleaned up).

– 7 –

The majority tried to limit *Rauda* as addressing only decisions over *when* or *whether* to execute a removal order. *See* Op. at 997. But that sort of limitation appears nowhere in the text of Section 1252(g) – which, again, covers "any" claims "arising from" the execution of a removal order. Moreover, the majority's attempted distinction has no basis in logic either. The execution of a removal order involves certain fundamental decisions – without any of which removal does not occur. Those are *whether* to execute the removal order, *when* to do so – and yes, *where* the alien must go. All of those actions are indispensable pieces of the "execution" of a removal order; Section 1252(g) thus necessarily bars "any cause or claim" arising from" those decisions too. *See also* Op. at 1012 (R. Nelson, J., dissenting) (the "decision to send [Ibarra-Perez] to Mexico was a part of ICE['s] executing that removal order, permitted under the INA – not a separate decision divorced from the order's execution").[1]

---

[1] Further, the majority also overlooked that, through approving citations of *E.F.L. v. Prim*, 986 F.3d 959 (7th. Cir. 2021), and *Camarena v. Dir.,ICE*, 988 F.3d 1268 (11th Cir. 2021), the *Rauda* Court also expressly rejected the premise, employed by the majority (Op. at 996-98), that characterizing challenges to the decisions and actions listed in Section 1252(g) as challenges to legal authority makes a difference to the application of Section 1252(g). 55 F.4th at 777; *see also* Op. at 1005-06 (R. Nelson, J. dissenting) (discussing these cases and pointing out that "each circuit to resolve the question" whether collateral "challenges to the government's removal authority are exempt from" Section 1252(g)'s bar "has rejected the argument").

Given these inconsistencies, en banc intervention is needed to secure the uniformity of this Court's precedent. Indeed, a recent district court decision confirms that the majority's decision is causing substantial confusion over how and when Section 1252(g) applies. In *Wheeler v. ICE*, No. CV-25-103-GF-BMM, 2026 WL 74161 (D. Mont. Jan. 9, 2026), the district court candidly stated that it was "unclear whether the Court properly can exercise subject matter jurisdiction over this case based on the cited authority" reviewed in its decision – principally the majority's opinion and *Rauda*. *Id.* at *5. Both provided "guidance," but the court also distinguished each decision because the facts and the nature of the claim before the court – a complaint by an alien who had entered the United States pursuant to a visa waiver seeking a temporary restraining order to prevent her removal under a final order – "differ greatly." *See id.* at *4; *id.* at *5 (case "contains different facts" from *Rauda*). The district court did not attempt to construe and apply the text of Section 1252(g) itself in the light of either decision. Instead, given the conflicting signals, it resolved the jurisdictional question by relying on an "instructive" Seventh Circuit decision in which an alien had presented a similar claim to both the court of appeals and a district court. *See id.* (discussing *Ferreyra v. Barr*, 962 F.3d 331 (7th Cir. 2020)).

There is no doubt that this problem will proliferate in this Circuit, given the prominence of immigration actions, and the importance of Section 1252(g). And there is no reason for this Court to let such uncertainty and confusion persist for its own sake. So at minimum, regardless of what a majority of this Court thinks about the question presented, the full Court's review is badly needed to at least provide clarity as to whether *Rauda* or the panel decision offers the right way to approach Section 1252(g).

2. ***The decision conflicts with the decisions of other courts of appeals.*** In addition to conflicting with *Rauda*, the judgment also conflicts with similar decisions of other courts of appeals, as Judge Nelson identified. Op. at 1005. Those courts have rightly held that Section 1252(g) strips jurisdiction over claims seeking to delay an alien's removal based on legal challenges to some aspect of that removal, recognizing that such claims, however captioned, "arise from" the execution of a removal order.

- In *E.F.L.* the Seventh Circuit, contrary to the majority decision here, rejected a reading of Section 1252(g) that would allow collateral challenges to "DHS's 'legal authority' to execute her removal order." *Id.* at 964-65; *cf.* Op. at 998 ("Ibarra-Perez's FTCA suit is . . . premised on a lack of legal authority to remove him to Mexico"); *see also id.* at 997 ("Ibarra-Perez raises purely legal arguments in challenging his removal"). The *E.F.L.* Court

– 10 –

explained that Section 1252(g) "precludes judicial review of 'any' challenge to 'the decision or action by [DHS] to . . . execute removal orders'" – and "[t]hat includes challenges to DHS's 'legal authority' to do so." *Id.* at 965. Thus, the court concluded that the habeas petition, claiming that execution of the removal order before a pending application for benefits was adjudicated would violate Due Process Clause and the Administrative Procedure Act, *id.* at 962, "falls directly in § 1252(g)'s path." *Id.* at 964

- In *Camarena*, 988 F.3d at 1271-72, the Eleventh Circuit similarly ruled that it lacked jurisdiction over the petitioner's claim that that a "regulatory process should be interpreted to block their removal from the United States," concluding that the claim "amount[ed] to an attack on the government's execution of their removal orders" barred by Section 1252(g). Applying Section 1252(g) requires a "focus on the action being challenged," and that was the execution of the removal orders. *Id.* at 1272. Given the text of the statute – in particular, the reference to "any" claim or cause – the Court declared that it "may not engraft our own exceptions onto the statutory text," including "any discretion-versus-authority distinction." *Id.* at 1273.

- In *Tazu, supra*, the Third Circuit similarly held that Section 1252(g) stripped jurisdiction over a habeas corpus petition that "asks us to hold that the Attorney General must wait until later – after he finishes exhausting the

– 11 –

provisional-waiver process and appealing the denial of his motion to reopen" to execute his final order of removal. 975 F.3d at 296. The Court concluded that claims asserting a "general lack of authority to violate due process, equal protection, the Administrative Procedure Act, or some other federal law" are barred, reasoning it "would gut" Section 1252(g) if an alien "could restyle any challenge to the three actions listed in § 1252(g)" in that manner. *Id.* at 297-98.

- In, *Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018), the Sixth Circuit addressed claims seeking to delay the enforcement of removal orders that were not executable until Iraq began issuing travel documents for the return of aliens without unexpired passports. *See id.* at 872. The Court concluded that "[u]nder a plain reading of Section 1252(g), the "enforcement of long-standing removal orders falls squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review." *Id.* at 874.[2]

### B.    The Panel Decision Is Wrong

Section 1252(g) plainly bars FTCA jurisdiction over Ibarra-Perez's complaint and the majority erred in holding otherwise. Once more, the

---

[2] *See also, e.g.*, *Mapoy v. Carroll*, 185 F.3d 224, 230 (4th Cir. 1999) (action for injunctive relief against removal was a "a thinly veiled attempt to evade" Section 1252(g)).

statute provides that "notwithstanding any other provision of law . . . no court shall have jurisdiction to hear *any cause or claim*" "*arising from* the decision or action . . . to . . . execute removal orders against any alien under this chapter" that is brought "by or on behalf of any alien." 8 U.S.C. § 1252(g) (emphases added). Whatever the exact contours of the "arising from" phrase, it undeniably includes challenges to decisions about whether, when, and where to remove an alien pursuant to a valid removal order, *see AADC*, 525 U.S. at 483 (observing that Section 1252(g) focuses on judicial review of "the . . . discrete acts" listed therein, including executing removal orders); *see also Rauda*, 55 F.4th at 777.

Here, Ibarra-Perez challenges the decision and action to execute his removal order – indeed, that is all he challenges, as Judge Nelson's dissent explains in detail. Op. at 1003 ("Put simply, he challenges the execution of his removal order."). Accordingly, the district court lacked jurisdiction to hear them, and the dismissal should have been affirmed.

In assessing jurisdiction, the majority only nodded at Section 1252(g)'s text, quoting it but not attempting to construe it despite the Supreme Court's repeated reminder that, in addressing jurisdiction under the INA's judicial review scheme, its provisions "*must* be construed both with precision and with fidelity to the terms by which Congress has expressed its

– 13 –

wishes." *See Kucana v. Holder*, 558 U.S. 233, 252 (2010) (quoting *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212 (1968)) (emphasis added); *see also Stone v. INS*, 514 U.S. 386, 405 (1995) (same), *abrogated on other grounds*, *Riley v. Bondi*, 606 U.S. 259, 276 (2025).

The principal reason the majority gives for finding that Section 1252(g) does not bar jurisdiction lacks a tie to the current statutory text. The statute bars "any cause or claim," which, at the time Section 1252(g) was enacted, meant any "ground of legal action" or "demand for something (as money) due or believed to be due," *Merriam Webster's Dictionary of Law* 70, 79 (1996). But the majority stated that courts "retain jurisdiction to decide a 'purely legal *question*' that 'does not challenge the [agency's] discretionary authority,'" Op. at 996 (emphasis added), and for support, it reached back to a ruling of this Court not applied in any circuit precedent since 2005 – until this one. In *Ali v. Ashcroft*, 346 F.3d 873, 878-880 (9th Cir. 2003), this Court reasoned that Section 1252(g) did not speak clearly enough to eliminate habeas corpus actions and held that where a habeas petition raises a question whether the Attorney General has legal authority to take an action listed in Section 1252(g), a court has jurisdiction to consider that claim. The en banc ruling in *Hovespian* the next year – not a habeas case – repeated that point, relying on *Ali*, 359 F.3d at 1159. Then a 2005

– 14 –

amendment to Section 1252(g) eliminated that resort to habeas corpus as an exception, *see* REAL ID Act of 2005, Pub. L. 109-13, Div. B, Title I, § 106(a) (May 11, 2005) (amending Section 1252(g)). Given that amendment, that point would warrant reconsideration even if it had not been vacated, post-*Hovespian*, on other grounds, *see Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005) (amended opinion). By uncritically reviving that superseded reading of Section 1252(g), the majority clearly erred. *See also* Op. at 1008 n.3 (R. Nelson, J., dissenting) (discussing *Ali*); *id.* at 1010 (same). And in any event, merely identifying a "purely legal question" does not establish jurisdiction to hear a "cause or claim" raising that question. *See id.* at 1006 ("focusing on one legal question . . . neglects to determine our jurisdiction over Ibarra-Perez's entire claims").

The majority's text-based reason fares no better. The majority implicitly construed Section 1252(g) as not barring challenges to the execution of a removal order when the removal was or is to be to a country not designated in the order when it determined that Ibarra-Perez "does not challenge the 'execution' of a removal order" "because Mexico" – the country to which Ibarra-Perez was removed – "was not mentioned in the order of removal," Op. at 997. That reading lacks support in other provisions of the immigration laws, which show that the specification of the country of

– 15 –

removal is not an essential element of an order of removal. Under the INA, the selection of the country or countries of removal is addressed by a statutory provision that nowhere requires the country to be listed on the removal order before the alien can be sent there. *See* 8 U.S.C. § 1231(b)-(d). That makes sense because the execution of a removal order may entail myriad practical problems that must be resolved by ICE, *see Johnson v. Guzman Chavez*, 594 U.S. 523, 538 (2021), for which there may be no need to return to an immigration judge even when an alternative destination country is identified. Rather, as the Court recognized, an immigration judge in a removal proceeding is only required *by regulation* to identify a country or countries for removal in rendering a decision, but that regulation *expressly states* that the immigration judge's decision "does not limit the authority of the Department of Homeland Security to remove the alien to any other country as permitted by" law. *See* 8 C.F.R. § 1240.12(d); Op. at 995; *see also* Op. at 1016-17 (R. Nelson, J., dissenting).

Other provisions of the INA are consistent. The statute setting forth the process in Ibarra-Perez's own case only requires an immigration judge to "decide whether an alien is removable," 8 U.S.C. § 1229a(c)(1)(A). And Congress's definition of "order of deportation" enacted for purposes of the INA – which also sheds light on the meaning of "order of removal" or

"removal orders" in Section 1252(g), *see Nasrallah v. Barr*, 590 U.S. 573, 579 (2020) (construing "final order of removal" for purposes of another judicial review limitation with reference to that definition), similarly does not require a removal order to specify a country of removal to count. *See* 8 U.S.C. § 1101(a)(47)(A) (order need only "conclud[e] that the alien is [remov]able or order[] [removal]"). Consequently, there is no basis for the Court's reading of Section 1252(g) as barring challenges to execution of removal orders only when the removal is to the country designated therein.

Instead, in view of these statutes and regulations, Section 1252(g) is best read, as Judge Nelson explained, as meaning that the government "'executes' [a] removal order" whenever it decides or takes action to "remove[] an alien to a country authorized" under Section 1231 "or another statute." And here, because "[n]o order – either from the IJ or a court – prohibited the government['s] executing that removal order to send him to Mexico," Op. at 1010 (R. Nelson, J. dissenting), Ibarra-Perez's claim challenges the execution of his removal order and is barred by Section 1252(g).

Finally, even if a departure from the statutory text could be justified by the majority's concerns about the result, those concerns are misplaced. The majority expressed a fear that under this construction of Section

1252(g), "any post-hearing decision by ICE to remove noncitizens to third countries" would be "entirely insulate[d]" from judicial review," and that "ICE can simply wait until removal proceedings end and then immediately remove someone, without notice, to a country where he or she faces imminent persecution, torture, or death," Op. at 997, 1000. But contrary to the majority's view (Op. at 1000), Ibarra-Perez had administrative and judicial avenues "to protect himself" both before and after removal by filing a motion urging the immigration judge to reopen his removal proceeding or reconsider his removal order after learning Mexico had been designated as the country of removal, claiming he fears persecution or torture there, and seeking judicial review of any adverse final agency decision. An alien in a removal proceeding under 8 U.S.C. § 1229a has a statutory right to file a motion to reopen or a motion to reconsider, 8 U.S.C. § 1229a(c)(6)-(7), and to petition for judicial review of a denial, *Mata v. Lynch*, 576 U.S. 143, 148 (2015). Contrary to the majority's view (Op. at 1000) that the actions by the ICE officers made seeking that relief "impossible," Circuit precedent confirms that Ibarra-Perez could have filed a motion to reopen or reconsider even after his removal, *see Toor v. Lynch*, 789 F.3d 1055, 1060-61 (9th Cir. 2015), and also could have pursued judicial review of an adverse decision from abroad, *see Rauda*, 55 F.4th at 781. These processes mean that Section

– 18 –

1252(g) does not have the effect of insulating post-final order immigration

enforcement decisions from effective judicial review, but just cuts off

district court challenges under other causes of actions or other judicial

remedies not authorized by the INA.

## CONCLUSION

For the foregoing reasons, the Court should order rehearing or

rehearing en banc.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIMOTHY COURCHAINE
United States Attorney

MELISSA NEIMAN-KELTING
s/BRYAN S. BEIER
Attorneys, Office of Immigration Litigation
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

Dated: March 12, 2026          *Attorneys for Respondents-Appellants*

and SEC civil enforcement actions is by design. Congress imposed an economic loss requirement in private securities actions to address "abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). But as SEC civil enforcement actions are not subject to abusive litigation by private parties, Congress did not extend the economic loss requirement to such actions. *See Gebhart v. SEC*, 595 F.3d 1034, 1040 n.8 (9th Cir. 2010). Reading an economic loss requirement into § 78u(d)(5) would undermine, rather than effectuate, the statutory scheme.

### B

**[8, 9]** Neither party argues, and there is no reason to suppose, that the disgorgement remedy authorized by subsection (d)(7) is narrower than the one available under subsection (d)(5). Our holding that pecuniary harm is not required under subsection (d)(5) thus also means that it is not required under subsection (d)(7).

### IV

In sum, we join the First Circuit in holding that the SEC is not required to show that investors suffered pecuniary harm as a precondition to a disgorgement award under § 78u(d)(5) or (d)(7). *See Navellier*, 108 F.4th at 41 & n.14. The judgment of the district court is therefore **AFFIRMED**.



---

1627. Congress imposed the economic loss requirement, codified at 15 U.S.C. § 78u-4(b)(4), as part of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 101, 109 Stat. 737, 747 (1995).

---

**Jorge Felix IBARRA-PEREZ, also known as Jorge Ibarra-Perez, Plaintiff - Appellant,**

v.

**UNITED STATES of America, Defendant - Appellee.**

**No. 24-631**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 2025 Phoenix, Arizona

Filed August 27, 2025

**Background:** Noncitizen brought action under Federal Tort Claims Act (FTCA) alleging false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress based on his earlier removal to Mexico. The United States District Court for the District of Arizona, Dominic W. Lanza, J., 2024 WL 216769, dismissed complaint, and noncitizen appealed.

**Holdings:** The Court of Appeals, W. Fletcher, Circuit Judge, held that:

(1) noncitizen's action did not fall within scope of Immigration and Nationality Act's (INA) jurisdiction-stripping provision, and

(2) INA provisions requiring that all questions arising from action or proceeding to remove noncitizen be brought in petition for review did not bar action.

Reversed and remanded.

R. Nelson, Circuit Judge, dissented and filed opinion.

990    **154 FEDERAL REPORTER, 4th SERIES**

**1. Federal Courts ⟝3581(1)**

Court of Appeals reviews de novo district court's determination of its subject matter jurisdiction.

**2. Aliens, Immigration, and Citizenship ⟝338**

**Constitutional Law ⟝4438**

Department of Homeland Security (DHS) must notify individuals who are subject to deportation that they have right to apply for asylum in United States and for withholding of deportation to country to which they will be deported; otherwise, DHS violates their constitutional right to due process. U.S. Const. Amend. 5; Immigration and Nationality Act § 241, 8 U.S.C.A. § 1231(b)(3)(A).

**3. Constitutional Law ⟝961**

Where Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear.

**4. Aliens, Immigration, and Citizenship ⟝385**

Immigration and Nationality Act's (INA) jurisdiction-stripping provision does not deprive courts of jurisdiction to decide purely legal questions that do not challenge Attorney General's discretionary authority, even if answer to that legal question forms backdrop against which Attorney General later will exercise discretionary authority. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**5. Aliens, Immigration, and Citizenship ⟝385**

Noncitizen's action under Federal Tort Claims Act (FTCA) alleging false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress based on his objection to his removal to Mexico after immigration judge (IJ) denied his asylum application was not challenge to execution of removal order, and

thus did not fall within scope of Immigration and Nationality Act's (INA) jurisdiction-stripping provision, where noncitizen did not contend that Immigration and Customs Enforcement (ICE) was categorically forbidden to remove him to Mexico, but instead claimed that in removing him to Mexico without meaningful notice and opportunity to present fear-based claim, ICE officials violated Due Process Clause, INA, and international law. U.S. Const. Amend. 5; Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g); 28 U.S.C.A. §§ 1346, 2671 et seq.

**6. Aliens, Immigration, and Citizenship ⟝384**

Immigration and Nationality Act (INA) provisions requiring that all questions of law and fact arising from any action or proceeding to remove noncitizen be brought in petition for review did not bar noncitizen's action under Federal Tort Claims Act (FTCA) alleging false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress based on his objection to Immigration and Customs Enforcement's (ICE) separate decision to remove him to Mexico after completion of his removal proceedings. Immigration and Nationality Act § 242, 8 U.S.C.A. §§ 1252(a)(5), 1252(b)(9).

———————

Appeal from the United States District Court for the District of Arizona Dominic Lanza, District Judge, Presiding, D.C. No. 2:22-cv-01100-DWL-CDB

Trina A. Realmuto (argued), Mary A. Kenney, and Aidan Langston, National Immigration Litigation Alliance, Brookline, Massachusetts; Laura Belous, Rocio C. Acosta, Florence Immigrant and Refugee Rights Project, Tucson, Arizona; for Plaintiff-Appellant

Joshua Dos Santos (argued) and Mark B. Stern, Attorneys; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; Theo Nickerson, Attorney; Brock J. Heathcotte, Assistant United States Attorney; Gary M. Restaino, United States Attorney; Office of the United States Attorney, United States Department of Justice, Phoenix, Arizona; for Defendant-Appellee.

Matt Adams and Christopher Strawn, Northwest Immigrant Rights Project, Seattle, Washington, for Amicus Curiae Northwest Immigrant Rights Project.

Before: Michael Daly Hawkins, William A. Fletcher, and Ryan D. Nelson, Circuit Judges.

Opinion by Judge W. Fletcher;

Dissent by Judge R. Nelson.

## OPINION

W. FLETCHER, Circuit Judge:

After a hearing before an Immigration Judge ("IJ"), at which he had sought relief based on persecution in Cuba, plaintiff-appellant Jorge Felix Ibarra-Perez was granted withholding of removal to Cuba. Ibarra-Perez had stayed briefly in Mexico after he left Cuba and before he came to the United States. At his hearing before the IJ, Ibarra-Perez had described not only persecution in Cuba but also threats and extortion in Mexico. The government had not asked for an order removing Ibarra-Perez to Mexico, and the IJ did not designate Mexico as a country to which he could be removed. Neither the government nor Ibarra-Perez appealed the IJ's decision to the Board of Immigration Appeals ("BIA").

After completion of proceedings before the IJ, federal immigration officials removed Ibarra-Perez to Mexico. Ibarra-Perez vehemently objected to the removal, repeatedly telling the officials that he feared what would happen to him if he were removed to Mexico. While in Mexico after his removal, Ibarra-Perez was recruited and threatened by gang members. He was able to return to the United States two days after his removal. Upon his return to the United States, he was detained for six months before being granted asylum.

Ibarra-Perez brought suit for damages under the Federal Tort Claims Act ("FTCA"), contending that he was improperly removed to Mexico. The district court dismissed Ibarra-Perez's suit for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

The merits of Ibarra-Perez's FTCA suit are not before us. The question before us is jurisdictional—whether the limitation contained in 8 U.S.C. § 1252(g) should be read broadly to preclude Ibarra-Perez's suit, or whether it should be read narrowly to allow it. The Supreme Court has instructed that we should read § 1252(g) narrowly. *See Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020). Following the Court's instruction, we hold that the district court has subject matter jurisdiction over Ibarra-Perez's FTCA suit.

We therefore reverse.

## I. Background

Because Ibarra-Perez's suit was dismissed under Rule 12(b)(1), we accept as true all of the plausible factual allegations in his complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The government does not contend that his allegations are implausible.

The following narrative is based on these allegations.

Ibarra-Perez fled Cuba after two decades of beatings, surveillance, threats, and harassment because of his opposition to the Castro regime. Before arriving at the United States, Ibarra-Perez spent several months in Mexico. While in Mexico, Ibarra-Perez was "extorted by Mexican police officers and other authorities on multiple occasions, and forced to pay officers money in order to avoid detention and deportation to Cuba." Ibarra-Perez applied for asylum in Mexico. Mexico denied asylum but granted a one-year humanitarian visitor permit.

To escape the threats and extortion in Mexico, Ibarra-Perez presented himself at the DeConcini Port of Entry in Nogales, Arizona in August 2019, seeking asylum in the United States. In September 2019, U.S. Customs and Border Protection took Ibarra-Perez into immigration custody and issued a Notice to Appear, charging him with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I).

Ibarra-Perez filled out a *pro se* application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on a Form I-589. Because Ibarra-Perez has limited ability to read and write in English, he had another detained person help him fill out the application. He indicated on the form that "he did not consider Mexico to be a 'safe country.' " In addition to his Form I-589, Ibarra-Perez submitted a declaration in Spanish that was translated into English. In that declaration, he "detailed the multiple times [he had been] threatened and extort-ed while in Mexico." Ibarra-Perez's Form I-589 and declaration were submitted to the immigration court, and an Immigration and Customs Enforcement ("ICE") attorney received copies.

On January 10, 2020, Ibarra-Perez had a hearing before IJ Jennifer I. Gaz. Ibarra-Perez appeared *pro se*. At the hearing, Ibarra-Perez described the persecution he had suffered in Cuba. He explained if he had not received a humanitarian visa from Mexico, he "might have been jailed by the government or deported back to Cuba" or "maybe [he] might have been kidnapped." He also stated that he feared removal to Mexico. The IJ found that Ibarra-Perez had suffered past persecution in Cuba on account of his political opinion and granted him withholding of removal to Cuba. At no point did the IJ designate Mexico, or any other country, as an alternative country of removal. Government counsel never mentioned Mexico as a possible country of removal during proceedings before the IJ.

In her order withholding removal to Cuba, the IJ wrote that she would have granted asylum to Ibarra-Perez if she had not been prevented from doing so by the Transit Ban then in effect. That ban required migrants who passed overland through another country or countries on their way to the southern border of the United States to first seek asylum in one of those countries. *See* 8 C.F.R. § 1208.13(c) (2020).[1]

Continuing to act *pro se* and believing that the IJ's order granting him withholding of removal to Cuba "prevented him from being deported from the United States," Ibarra-Perez did not appeal the

---

[1]. Though it is not critical to our decision, we note that the IJ likely erred in concluding that the Transit Ban barred Ibarra-Perez's asylum application. Ibarra-Perez testified during his hearing before the IJ that he had sought asylum in Mexico before seeking entry into the United States. Ibarra-Perez was asked whether he had applied for asylum in Mexico. He responded, "Yes." He was then asked, "Was the application granted or denied?" He responded, "No. I received a humanitarian visa for a year."

IBARRA-PEREZ v. U.S.                    993
Cite as 154 F.4th 989 (9th Cir. 2025)

LJ's denial of asylum. The government did not appeal the LJ's grant of withholding of removal. The LJ's decision thus became final. *See* 8 C.F.R. § 1003.39 (2025); 8 U.S.C. § 1101(a)(47)(B)(i)–(ii).

The government continued to detain Ibarra-Perez. Because withholding of removal is country specific, the government "retain[ed] the authority to remove [Ibarra-Perez] to any other country authorized by statute." *Johnson v. Guzman Chavez*, 594 U.S. 523, 536, 141 S.Ct. 2271, 210 L.Ed.2d 656 (2021). On January 14, 2020, an ICE officer contacted consular representatives from Mexico, Nicaragua, and Colombia to inquire whether they would allow Ibarra-Perez entry into their countries. The next day at 12:35 p.m., Mexico agreed to accept him. At about 2:00 p.m. that day, while Ibarra-Perez was in a holding cell, an ICE agent told him in English that he would be deported to Mexico. Ibarra-Perez, who understood some English, told the officer that he could not go back to Mexico and asked if he could be removed to Spain or Canada instead. The ICE officer promised to return with more information but never came back. Later that day, while Ibarra-Perez was still in the holding cell, an ICE officer with a computer translation program, wrote on the computer that Ibarra-Perez would be deported to Mexico. Ibarra-Perez told the officer that he was afraid to be deported to Mexico. The officer left without providing any further information.

An ICE officer later asked a Spanish speaking guard to translate for Ibarra-Perez. The guard told Ibarra-Perez that he would be deported "whether he liked it or not." Ibarra-Perez panicked and raised his voice, saying he could not be deported because he had won his case. ICE officers handcuffed Ibarra-Perez, bound him at the ankles and waist, and took him in a van to Florence, Arizona. Ibarra-Perez told an ICE officer at Florence that we was "afraid to be deported to Mexico." The officer ignored him.

At about 6:00 a.m. on January 16, ICE officers delivered Ibarra-Perez to Mexican officials in Nogales, Sonora, Mexico. At 9:00 a.m., Ibarra-Perez was released from Mexican custody. It was "cold and rainy," and he was dressed only in the light clothing he had worn when he came to the United States border seeking entry. Ibarra-Perez went to a Mexican government office at about 11:00 a.m. A woman at the office told him to go look for work. At about noon, Ibarra-Perez contacted his daughter in Florida who wired approximately $100 to a bank in Mexico. He slept that night in a church-affiliated shelter.

The next day, January 17, Ibarra-Perez left the shelter to look for work. As he was walking, a truck with three men slowed down next to him. One of the men said he wanted to talk to Ibarra-Perez. Ibarra-Perez tried to keep walking. Another man opened his jacket and showed a gun. The men forced Ibarra-Perez into their truck. One of the men showed Ibarra-Perez photographs taken the day before, including a photograph of him getting the money his daughter had wired to him. The men told Ibarra-Perez that he had two options—to work for them as a drug mule or to pay them $500 per month. Ibarra-Perez told the men that he would give them an answer the next day. He asked them where he could find them. They responded, "We'll find you."

Ibarra-Perez went to a food hall run by the "Kino Border Initiative" and told "other immigrants" there what had happened. "They told him he could pay, work for the criminal groups, disappear and end up dead, or turn himself in at the U.S. border." An attorney from the Florence Immigration & Refugee Rights Project was providing legal services to the Kino Border

Initiative that day. The attorney contacted an ICE official. Later that day, accompanied by the attorney, Ibarra-Perez presented himself at the Port of Entry in Nogales. Ibarra-Perez was allowed to physically reenter the United States, but was taken into custody.

On January 21, a new Notice to Appear was issued, charging Ibarra-Perez with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Ibarra-Perez's attorney moved successfully before IJ Gaz to dismiss the new Notice to Appear and to reopen Ibarra-Perez's earlier proceeding. The IJ found that "[r]eopening is appropriate in light of the due process concerns." (Brackets in original.) She wrote that the government has " 'an affirmative obligation' that applies 'regardless of whether the country of deportation is designated during or after removal proceedings—to provide a meaningful opportunity to be heard on asylum and withholding claims regarding any potential country of removal.' "

While the reopened proceeding was pending before the IJ, our court held on July 6, 2020, that the Transit Ban was invalid. *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020), *amended by*, 994 F.3d 962 (9th Cir. 2020). On July 16, the IJ granted asylum to Ibarra-Perez based on his past persecution in Cuba and dismissed his withholding and CAT claims as moot. The government did not appeal. Ibarra-Perez was held in continuous custody from the time of his reentry in January until the IJ's decision in July.

Ibarra-Perez brought suit under the FTCA for damages suffered as a result of what he contends was an illegal removal to Mexico. He alleges false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress. The district court dismissed his complaint because it concluded it lacked subject matter jurisdiction under 8 U.S.C. § 1252(a)(5), (b)(9), and (g). Ibarra-Perez timely appealed.

## II. Standard of Review

[1]  We have appellate jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's determination of its subject matter jurisdiction. *Garcia v. Serv. Emps. Int'l Union*, 993 F.3d 757, 762 (9th Cir. 2021).

## III. Discussion

### A. Country-of-Removal Designations

The statute that governs determination of countries to which a noncitizen can be removed is 8 U.S.C. § 1231. Section 1231(b)(1) applies to "Aliens arriving at the United States." This subsection refers only to arrivals by "vessel or aircraft," but it has been interpreted to apply to other means of arrival at the border. *See* 8 C.F.R. § 241.25(d) ("Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory."); *see also Jama v. ICE*, 543 U.S. 335, 351 n.11, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) ("[Section] 1231(b)(1) . . . applies only to aliens placed in removal proceedings immediately upon their arrival at the border."). Section 1232(b)(2) applies to "Other aliens." The two subsections prescribe slightly different ways in which the country of removal is determined. Ibarra-Perez contends that removal in his case is governed by § 1231(b)(2). With the case in its current posture, the government has not taken a position on which subsection applies. For purposes of the appeal now before us, we need not decide that question, for our analysis applies to both subsections.

Both the immigration court and the Department of Homeland Security ("DHS"), which includes ICE, have authority to select a country of removal pursuant to § 1231(b)(1) and (b)(2). The immigration court acts first. "After determining that a noncitizen is removable, an IJ must assign a country of removal." *Hadera v. Gonzales*, 494 F.3d 1154, 1156 (9th Cir. 2007). The IJ "shall identify a country, or countries in the alternative, to which the alien's removal may in the first instance be made, pursuant to the provisions of [§ 1231(b)]." 8 C.F.R. § 1240.12(d); *see also id.* § 1240.10(f) ("The [IJ] shall also identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [§ 1231(b)(2)] if the country of the alien's designation" fails). The IJ's designation is subject to judicial review through the petition-for-review process. *See, e.g., Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004); *Hadera*, 494 F.3d at 1156–59; *Dzyuba v. Mukasey*, 540 F.3d 955, 957 (9th Cir. 2008) (per curiam).

[2] After immigration court proceedings have ended, "DHS retains the authority to remove the alien to any other country authorized by the statute." *Johnson*, 594 U.S. at 536, 141 S.Ct. 2271. If DHS "is unable to remove the alien to the specified or alternative country or countries, the order of the [IJ] does not limit the authority of [DHS] to remove the alien to any other country as permitted by [§ 1231(b)]." 8 C.F.R. § 1240.12(d); *see also id.* §§ 241.15, 208.16(f), 1208.16(f). However, there are restrictions on DHS's removal authority. For purposes of the case before us, the most important is 8 U.S.C.

§ 1231(b)(3)(A): "Notwithstanding [§ 1231(b)(1)] and [§ 1231(b)(2)] the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[2] DHS must also "notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported"; otherwise, DHS violates their constitutional right to due process. *Andriasian*, 180 F.3d at 1041; *see also Wani Site v. Holder*, 656 F.3d 590, 594 (7th Cir. 2011) ("We recognize that the government retains broad discretion to designate a country of removal . . . . But it must exercise that authority in the appropriate way . . . .").

### B. Section 1252(g)

[3] The only question presented in this case is whether 8 U.S.C. § 1252(g) precludes federal courts from exercising subject matter jurisdiction over his suit. " '[W]e are guided here . . . by the general rule to resolve any ambiguities in a jurisdiction-stripping statute in favor of the narrower interpretation,' and by the 'strong presumption in favor of judicial review.' " *Arce v. United States*, 899 F.3d 796, 801 (9th Cir. 2018) (per curiam) (citations omitted) (first quoting *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 894 (9th Cir. 2004); then quoting *INS v. St. Cyr*, 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."

---

**2.** Section 1231 refers to the Attorney General. In 2002, Congress transferred the Attorney General's immigration enforcement responsibilities to the Secretary of Homeland Security. *Clark v. Martinez*, 543 U.S. 371, 374 n.1, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). We therefore interpret references to the Attorney General as referring to the Secretary.

*Webster v. Doe*, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

Section 1252(g) provides in relevant part: "[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or *execute removal orders* against any alien under this chapter." (Emphasis added.).

The Supreme Court has given a "narrow reading" to § 1252(g). *AADC*, 525 U.S. at 487, 119 S.Ct. 936; *see also Regents of the Univ. of Cal.*, 591 U.S. at 19, 140 S.Ct. 1891 ("Section 1252(g) is … narrow."). "The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.' " *AADC*, 525 U.S. at 482, 119 S.Ct. 936 (emphasis in original) (quoting 8 U.S.C. § 1252(g)). Instead of "sweep[ing] in any claim that can technically be said to 'arise from' the three listed actions," the provision "refer[s] to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (plurality opinion) (describing the holding of *AADC*). "There are of course many … decisions or actions that may be part of the deportation process" not implicated by § 1252(g), "such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *AADC*, 525 U.S. at 482, 119 S.Ct. 936.

[4] The Court has characterized § 1252(g) as a "discretion-protecting provision." *Id.* at 487, 119 S.Ct. 936. The Court wrote, "Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecuto-

rial discretion." *Id.* at 485 n.9, 119 S.Ct. 936. We have jurisdiction to decide a "purely legal question" that "does not challenge the Attorney General's discretionary authority." *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (citing *Ali v. Ashcroft*, 346 F.3d 873, 878–79 (9th Cir. 2003), *vacated on other grounds sub nom., Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005)); *see Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119–21 (9th Cir. 2001); *Cath. Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc). We have jurisdiction "even if the answer to that legal question … forms the backdrop against which the Attorney General later will exercise discretionary authority." *Hovsepian*, 359 F.3d at 1155; *see, e.g., Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023) (holding FTCA challenge to detention not barred by § 1252(g) because "[Kong's] assertions of illegal detention [were] plainly collateral to ICE's prosecutorial decision to execute Kong's removal"); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While [§ 1252(g)] bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); *Bowrin v. INS*, 194 F.3d 483, 488 (4th Cir. 1999) ("[Section] 1252(g) stripped the federal courts of jurisdiction only to review challenges to the Attorney General's decision to exercise her discretion to initiate or prosecute [the three] specific stages of the deportation process.").

[5] The government argues that Ibarra-Perez's FTCA suit, objecting to his removal to Mexico by ICE, falls "squarely" within § 1252(g). In the government's view, Ibarra-Perez's objection to his removal to Mexico is a challenge to "execution" of a

removal order within the meaning of § 1252(g). We disagree.

Ibarra-Perez raises purely legal arguments in challenging his removal. He does not contend that ICE was categorically forbidden to remove him to Mexico. Rather, he contends that he had a right to meaningful notice and an opportunity to present a fear-based claim before he was removed to Mexico. ICE officials removed Ibarra-Perez to Mexico despite Ibarra-Perez's Form I-589, declaration, and testimony before the IJ, all of which indicated that he had good reason to fear returning to Mexico, and despite Ibarra-Perez having repeatedly told ICE officials that he so feared. Ibarra-Perez alleges that in removing him to Mexico, ICE officials violated the Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act ("INA"), and international law. For example, he points to our holding in *Andriasian* that a "last minute" country of removal designation "violated a basic tenet of constitutional due process." 180 F.3d at 1041. He also contends that ICE did not have the statutory authority to remove him to Mexico without having first given him an opportunity to present a fear-based claim, pointing out that ICE's removal authority under § 1231(b)(1) and (b)(2) is subject to the protections specified in (b)(3). *See* 8 U.S.C. § 1231(b)(3).

Ibarra-Perez does not challenge ICE's discretionary authority to decide "when" or "whether" to execute a removal order. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Rauda v. Jennings*, 55 F.4th 773, 777 (9th Cir. 2022). He does not claim, for example, that ICE should have delayed his removal or exercised its discretion not to remove him. Instead, he challenges ICE's separate decision about *where* to send him. *Cf. Johnson*, 594 U.S. at 536–40, 141 S.Ct. 2271 (removal orders are "separate" from with-holding-of-removal orders that limit "where" a noncitizen can be removed). His removal order designated Cuba as his country of removal and did not list an alternative country of removal. Because Mexico was not mentioned in the order of removal, Ibarra-Perez does not challenge the "execution" of his removal order.

There is a reason the Supreme Court has instructed that the jurisdictional bar of § 1252(g) is narrow, applying "only to three discrete actions the Attorney General may take: her 'decision or action' to *commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482, 119 S.Ct. 936 (emphasis in original). The government's broad reading of § 1252(g) would lead to a result that is not contemplated in the statute and that has been disavowed by the Supreme Court. The government's reading of § 1252(g) would entirely insulate from judicial review any post-hearing decision by ICE to remove noncitizens to third countries where they would be in danger of persecution, torture, and even death.

Our cases decided under § 1252(g) are consistent with our narrow reading. From the beginning, we have been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders. In *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998)—one of our first cases to interpret § 1252(g)—we specifically held § 1252(g) did not bar due process claims. *Id.* at 1052–53; *see also Sulit v. Schiltgen*, 213 F.3d 449, 453 (9th Cir. 2000). There, plaintiffs sought injunctive relief on the ground that certain Immigration and Naturalization Service administrative procedures used to obtain final orders with respect to document fraud violated their due process rights. *Walters*, 145 F.3d at 1036. These orders "render[ed] the [noncitizen] deportable and permanently excludable."

*Id.* The government argued the district court lacked jurisdiction under § 1252(g) to issue an injunction prohibiting the deportation (as it was then called) of noncitizens that received inadequate process. *Id.* at 1052. We held § 1252(g) "does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims." *Id.* Plaintiffs' due process claims did "not arise from a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien,' but instead constitute 'general collateral challenges to unconstitutional practices and policies used by the agency.'" *Id.* (quoting 8 U.S.C. § 1252(g); then quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991)). We wrote, "Although the constitutional violations ultimately may have led to the plaintiffs' erroneous deportation, the resulting removal orders were simply a consequence of the violations, not the basis of the claims." *Id.*

*Arce*, a recent case decided in our circuit, also supports our subject matter jurisdiction. Anaya Arce expressed a fear of harm if removed to Mexico. *Arce*, 899 F.3d at 798. An asylum officer determined that he had not established a reasonable fear of persecution or torture. *Id.* An IJ agreed with that determination. *Id.* at 799. Anaya Arce then obtained a temporary stay of removal from our court. *Id.* Despite the stay of removal, DHS officials removed him to Mexico. *Id.* Our court ordered that he be brought back to the United States. *Id.* Once back in the United States, Anaya Arce brought suit under the FTCA, alleging false arrest and imprisonment, intentional infliction of emotional distress, and negligence. *Id.* He sought "damages suffered as a result of the wrongful removal." *Id.* at 798.

The government argued that the claims in Anaya Arce's FTCA suit "f[e]ll squarely within the scope of § 1252(g) because they 'ar[ose] from' the Attorney General's decision or action to execute the removal order," and that we therefore had no subject matter jurisdiction. *Id.* at 799. We disagreed, holding that we had jurisdiction because Anaya Arce's FTCA suit was premised on a lack of legal authority to remove him to Mexico. *Id.* at 800. We wrote that Anaya Arce "points out—correctly—that the Attorney General lacked the authority to execute the removal order because of the stay of removal issued by our court." *Id.*

Ibarra-Perez's FTCA suit is similarly premised on a lack of legal authority to remove him to Mexico. He argues that before he could be removed to a country not named in his removal order, he had due process and statutory rights to present evidence supporting his contention that he would suffer cognizable harm if he were removed to that country. He brings nearly identical tort claims to those brought by Anaya Arce, who also sought damages for wrongful removal. *Arce* forecloses our dissenting colleague's argument that Ibarra-Perez cannot bring tort claims based on his allegedly wrongful removal to Mexico. Our dissenting colleague attempts to narrow *Arce* to its facts, arguing that its holding only applies to violations of court orders. However, we see no reason to treat a violation of a Ninth Circuit court order any differently from a violation the Constitution, INA, or international law.

The government relies on our recent decision in *Rauda*, to argue that § 1252(g) precludes our exercise of jurisdiction. We disagree with the government. Matias Rauda was ordered removed to El Salvador by an IJ; the BIA dismissed his appeal; and we denied his petition for review. *Rauda*, 55 F.4th at 776. Matias Rauda

then moved to reopen before the BIA. *Id.* While his motion to reopen was pending and his removal order remained in effect, Matias Rauda filed a habeas petition in district court and sought a temporary restraining order that would enjoin the government from removing him until the BIA ruled on his motion to reopen. *Id.* We held that the Attorney General's decision as to when to execute Rauda's valid removal order was a discretionary decision shielded by § 1252(g) from judicial review. We wrote, "[T]he discretion to decide *whether* to execute a removal order includes the discretion to decide *when* to do it." *Id.* at 777 (emphasis in original) (quoting *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 297 (3d Cir. 2020)).

*Rauda* made no new law. It fits easily into a long series of decisions in our circuit and sister circuits holding that discretionary decisions are shielded from review. *See, e.g., Arce*, 899 F.3d at 800–01; *Hovsepian*, 359 F.3d at 1155; *Ali*, 346 F.3d at 878–79; *Barahona-Gomez*, 236 F.3d at 1119–21; *Cath. Soc. Servs.*, 232 F.3d at 1150; *Kong*, 62 F.4th at 617; *Madu*, 470 F.3d at 1368; *Jama v. INS*, 329 F.3d 630, 632 (8th Cir. 2003), *aff'd sub nom. Jama v. ICE*, 543 U.S. 335, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005); *Bowrin*, 194 F.3d at 488. Unlike Rauda, Ibarra-Perez does not challenge ICE's discretionary authority about "when" to remove him or "whether" to remove him. Rather, Ibarra-Perez objects to ICE's separate decision about "where" to send him. Specifically, he objects to the lack of process afforded him in connection with having been sent to a country not designated in the IJ's removal order, despite his vehement and repeated objections that he feared being sent there.

Our dissenting colleague argues at length that § 1252(g) is not limited to discretionary decisions. His argument is foreclosed by our case law. As we wrote in *Arce*, "[W]e are bound by our own precedent that limits § 1252(g)'s scope to discretionary decisions that [the Secretary] actually has the power to make, as compared to the violation of his mandatory duties." 899 F.3d at 801. We have jurisdiction to review Ibarra-Perez's purely legal arguments challenging ICE's removal to Mexico without providing any process that would have allowed him to present evidence supporting his fear of removal to that country.

C. Sections 1252(a)(5) and (b)(9)

The government makes no argument under § 1252(a)(5) and (b)(9)—two provisions aimed at channeling noncitizens' claims into the petition-for-review process. It notes in its brief to us that the district court had held that these sections "bar jurisdiction to the extent that plaintiff attempts to challenge prior removal proceedings," and that Ibarra-Perez "has disclaimed any challenge to the prior removal proceedings and order." We agree with the government that Ibarra-Perez has not brought any challenge under § 1252(a)(5) and (b)(9), and that those provisions are not before us.

Despite the refusal of the government to make any argument based on these provisions, our dissenting colleague relies on them to argue that the petition-for-review process in the immigration court was the proper pathway for Ibarra-Perez to challenge his post-hearing removal. We briefly address § 1252(a)(5) and (b)(9) to make the following clear: If § 1252(g) bars jurisdiction to review removals outside of removal proceedings, and if § 1252(a)(5) and (b)(9) provide the only remedy to Ibarra-Perez, ICE can send *anyone* to *any* country without *any* review. Section 1252(g) is not such a bar, and § 1252(a)(5) and (b)(9) do not provide the only remedy to someone in Ibarra-Perez's position.

Section 1252(a)(5) provides that a petition for review is "the sole and exclusive means for judicial review of an order of removal." Section 1252(b)(9) is a "'zipper clause' that consolidates all 'questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien' into a petition for review." *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012) (quoting § 1252(b)(9)). The "arising from" language appears broad, but the Supreme Court has cautioned against an "expansive" interpretation of § 1252(b)(9) that would lead to "absurd" results and make certain claims "effectively unreviewable." *Jennings*, 583 U.S. at 293, 138 S.Ct. 830. We have held that § 1252(b)(9) does not does bar claims that are "independent of or collateral to the removal process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016).

[6] Because Ibarra-Perez challenges ICE's actions taken after his removal proceedings before the IJ and BIA had ended, neither section applies. Section 1252(a)(5) does not apply because Ibarra-Perez does not seek review of his removal order. *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D. Wash. 2019) (holding that a habeas petitioner's challenge to a country-of-removal designation was not barred by § 1252(a)(5) because ICE acted "outside of removal proceedings"). Similarly, § 1252(b)(9) does not apply because Ibarra-Perez brings claims that arose after completion of his removal proceedings.

Instead, Ibarra-Perez challenges ICE's separate and post-hearing decision to remove him to Mexico. He could not have contested this decision through the normal petition-for-review process because it was made after his removal proceedings had ended. The government attorney never mentioned Mexico as a possibility during Ibarra-Perez's proceedings before the IJ, and the IJ did not designate Mexico as an alternative country of removal. To state the obvious, Ibarra-Perez could not seek review of a decision that had not been made.

Our dissenting colleague suggests that a motion to reopen is the proper procedural pathway for Ibarra-Perez to challenge his removal to Mexico. He suggests that once Ibarra-Perez had notice that Mexico was his proposed country of removal, he could have moved to reopen his removal proceedings to present a new fear-based claim addressed to Mexico. The suggestion blinks reality. The actions of ICE officials made that impossible. Ibarra-Perez made clear to ICE officials, loudly and repeatedly, that he feared removal to Mexico. Instead of pausing to allow him to file a motion to reopen, they immediately removed him.

In sum, Ibarra-Perez had no reasonable opportunity for judicial review of ICE's designation decision through the standard petition-for-review process. Under the dissent's expansive interpretation of § 1252(g), Ibarra-Perez would have no way to protect himself. This result is more than merely "harsh," as our dissenting colleague acknowledges. Dissent at 1017–18. It is dangerous. Under our colleague's view of the law, ICE can simply wait until removal proceedings end and then immediately remove someone, without notice, to a country where he or she faces imminent persecution, torture, or death. The dissent's approach would "completely immunize[ ] [DHS's] practices and procedures from due process challenges." *Walters*, 145 F.3d at 1052.

The dissent tries to distract us from the jurisdiction question that is before us by focusing on the merits of Ibarra-Perez's claims. We repeat: The merits of Ibarra-Perez's case are not before us. The question before us is whether the district court

has jurisdiction to decide those merits. We conclude that it does.

### IV. Conclusion

For the foregoing reasons, we reverse the district court's dismissal of Ibarra-Perez's complaint for lack of subject matter jurisdiction and remand for further proceedings.

**REVERSED AND REMANDED.**

R. NELSON, Circuit Judge, dissenting:

8 U.S.C. § 1252(g) strips our jurisdiction over "any cause or claim" arising from the government's decision to "execute removal orders." Jorge Ibarra-Perez argues that his removal to Mexico—under a final and valid removal order—was unlawful because the government did not timely tell him he would be sent to Mexico. He seeks damages to compensate his allegedly unlawful removal.

Ibarra-Perez's claims are meritless. In any event, we lack jurisdiction over them. He has improperly repackaged a challenge to his removal proceedings as tort claims. And by asking us to decide whether the government erred in enforcing his removal order, Ibarra-Perez asks us to do what Congress forbids: review the government's decision or action to "execute removal orders."

To hold otherwise, the majority invents an exception to Congress's commands. Under the majority opinion, legal questions about the government's removal authority are exempt from § 1252(g). Maj. at 996. This exception is foreclosed by the statutory text and Supreme Court precedent. And every circuit to address the majority's exception has rejected it. Congress meant what it said: "any cause or claim" arising from the execution of removal orders is barred.

The majority's holding is radical and sweeping. Under the majority's rule, *any* deportee can evade § 1252(g) and raise *any* claim about the government's authority to deport him.

The result? The majority intrudes where Congress said, "Keep out." Our back-logged immigration docket will now overflow more than ever with meritless collateral challenges to removal orders. And the Ninth Circuit will stand in the way as the Executive Branch attempts to faithfully execute the People's law. Because Congress has stripped our authority, I would affirm the district court's order dismissing Ibarra-Perez's suit for lack of jurisdiction. I dissent.

### I

Jorge Ibarra-Perez is a Cuban national who lived in Mexico. He alleges that he faced persecution in both countries. He presented at the southern border and sought asylum and withholding of removal. An immigration judge (IJ) found Ibarra-Perez removable, denied asylum, but granted withholding as to Cuba. Withholding of removal is country-specific relief. *Johnson v. Guzman Chavez*, 594 U.S. 523, 536, 141 S.Ct. 2271, 210 L.Ed.2d 656 (2021). It prohibits the government from removing an alien to a particular country, not from the United States altogether. *Id.* So the IJ entered an order authorizing Ibarra-Perez's removal with only one restriction: Ibarra-Perez couldn't be sent to Cuba.

Ibarra-Perez did not appeal his removal order. He waived his right to keep seeking asylum. And he waived any argument that the IJ failed to address his alleged persecution in Mexico. As a result, Ibarra-Perez's removal order became final and uncontested. *See* 8 U.S.C. § 1101(a)(47)(B).

The government prepared to enforce the order and sent Ibarra-Perez to Mexico,

where he had a humanitarian visa. *See id.* § 1231(b)(1). That surprised Ibarra-Perez. Ignoring his removal order, Ibarra-Perez wrongly thought he "won his case" because his removal to Cuba was withheld. Even though the IJ entered a valid removal order, Ibarra-Perez says that he didn't know he could be removed to Mexico. As he was being transported to Mexico, Ibarra-Perez told officials that he feared persecution in Mexico. He wanted to be sent to Spain or Canada instead.

Officials sent Ibarra-Perez to Mexico. After he arrived, three men allegedly demanded that he work as a drug mule. The men did not physically harm Ibarra-Perez, and Ibarra-Perez did not suffer any persecution while in Mexico. Still, after only two days in Mexico, he returned to the United States and sued the federal government. He believes the government should have designated Mexico as a country of removal before enforcing his removal order. Because the government didn't, Ibarra-Perez argues that his removal was unlawful. He brings claims for false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress under the Federal Tort Claims Act. The Biden Administration argued before the district court that § 1252(g) strips jurisdiction over those claims. The district court agreed and dismissed Ibarra-Perez's suit. Ibarra-Perez appealed, and the government renewed its jurisdictional argument.

## II

The district court got it right. Congress deprived the federal courts of jurisdiction over Ibarra-Perez's tort claims.

## A

Section 1252(g) strips jurisdiction over claims "arising from" the "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders." It applies to "any cause or claim," "any alien," and any federal court, and it governs "notwithstanding any other provision of law." *Id.* The language is clear. Federal courts should stay out of the enforcement of removal orders.

There is one exception. If another provision within § 1252 restores jurisdiction over a claim, § 1252(g) does not apply. 8 U.S.C. § 1252(g). Yet the other provisions of § 1252 don't encourage judicial involvement. The statute allows courts of appeals to review removal proceedings through the petition-for-review process. *Id.* § 1252(a)(1). That's it. The petition for review is the "sole and exclusive" means for judicial review of any questions—factual, legal, or constitutional—that arise from removal proceedings. *Id.* §§ 1252(a)(5), (b)(9). And even the petition-for-review process is limited. Courts must defer to the agency's factual findings, and discretionary decisions may be reviewed only for legal or constitutional error. *Id.* §§ 1252(a)(2)(B), (a)(2)(D), (b)(4).

Everyone agrees Ibarra-Perez's suit doesn't fall within § 1252(g)'s sole exception, the petition-for-review process. Ibarra-Perez waived his right to invoke that process. Thus, the question is whether Ibarra-Perez's tort claims fall within § 1252(g). If they do, his claims are barred—no exceptions.

Section 1252(g)'s scope is governed by its text. The statute does not strip jurisdiction over "all deportation-related claims." *Reno v. Am.-Arab Anti-Discrim. Comm.* (*AADC*), 525 U.S. 471, 478, 119 S.Ct. 936 (1999). "[W]hat § 1252(g) says is much narrower." *Id.* at 482, 119 S.Ct. 936. The statute bars challenges to three actions: commencing removal proceedings, adjudicating cases, and executing removal orders. 8 U.S.C. § 1252(g). Though the statute bars any claim "arising from" those

actions, a plurality of the Supreme Court has interpreted "arising from" as referring to "just those three specific actions themselves," not any action that bears a technical but-for relationship to them. *Jennings v. Rodriguez*, 583 U.S. 281, 294, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (plurality op.). Yet any challenge to the three listed actions outside the petition-for-review process is categorically barred.

**B**

Ibarra-Perez challenges the execution of his removal order, one of the three actions listed in § 1252(g). To see why, start with Ibarra-Perez's characterization of his own claims. He asserts that his removal to Mexico was "unlawful." But he disclaims any challenge to his pre-deportation removal proceedings. Instead, he says that his claims arose "after" the removal order was entered and when the government "initiated [his] deportation to Mexico." If that's true, Ibarra-Perez *must* be challenging the execution of his removal order. There's nothing else for him to challenge.

Consider next "the action[s] being challenged" in his complaint. *Camarena v. ICE*, 988 F.3d 1268, 1272 (11th Cir. 2021) (quotation omitted). Ibarra-Perez raises four tort claims. Each is tied to the execution of his removal order. Asserting false imprisonment, Ibarra-Perez alleges that the government wrongfully deprived his liberty by "physically deporting him" to Mexico. Asserting abuse of process, he claims that the government "deport[ed] [him] to a country without lawful notice." For his negligence claim, Ibarra-Perez argues that the government breached a duty "not to cause harm or injury" when it physically deported him. Finally, Ibarra-Perez alleges that officials intentionally inflicted emotional distress when they deported him to a country where they knew he'd be harmed. Each claim asserts that the government wrongfully removed him. That is, each attacks the government's "decision or action" to "execute [his] removal order[ ]." 8 U.S.C. § 1252(g). There's no other way to understand his claims.

Turn to the relief sought. *See Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998) (considering the remedy). Ibarra-Perez doesn't ask for an injunction remedying a due process violation. *Cf. id.* at 1037, 1052; *Cath. Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1142, 1150 (9th Cir. 2000) (en banc). Nor does he seek damages related to conduct collateral to his deportation. He seeks "compensation for the harms and losses he suffered as the result of [his] unlawful deportation." Put simply, he challenges the execution of his removal order.

Ibarra-Perez's briefing is more of the same. In his own words, "he challenges the tortious acts and omissions [of the government] in . . . removing him to Mexico." Over and over, Ibarra-Perez claims that he "was unlawfully deported," and that he's bringing "a tort claim for an unlawful removal." Of course, Ibarra-Perez also explains why he thinks his deportation was unlawful. Because the government allegedly failed to designate Mexico as a possible country of removal, the government "lacked the authority . . . to remove him to Mexico." But that merits-level procedural argument merely explains why Ibarra-Perez thinks the government was wrong to execute his removal order. It doesn't change the fact that, at bottom, Ibarra-Perez challenges the execution of that order. And claims challenging the validity of his removal order should have been brought through a motion to reopen.

"No matter how [Ibarra-Perez] frames it," *Rauda v. Jennings*, 55 F.4th 773, 778 (9th Cir. 2022), he challenges "the merits of the decision to execute [a] removal order[ ]," *Walters*, 145 F.3d at 1052. We lack jurisdiction over such claims.

C

The majority ignores all this. The majority never describes Ibarra-Perez's tort claims. It never discusses Ibarra-Perez's concessions, requested remedy, or complaint. Instead, the majority invents an exception to § 1252(g), holding that legal questions are exempt from the statute. That exception conflicts with the statutory text, Supreme Court precedent, and the holdings of our sister circuits. It also fails to address the question presented here.

1

According to the majority, § 1252(g) doesn't apply to "purely legal" questions "premised on the lack of legal authority" to remove an alien. Maj. at 996, 998. Because Ibarra-Perez argues that the government lacked legal authority to execute his removal order, the majority concludes that his claims are not a challenge to the execution of his removal order "within the meaning of § 1252(g)." *Id.* at 997.

This conclusion cannot be squared with the facts. By arguing that the government lacked authority to execute his removal order, Ibarra-Perez does just that—argue that the government wrongfully executed his removal order. If that's not a challenge to the "decision or action" to "execute removal orders," what is? *See* 8 U.S.C. § 1252(g).

More to the point, the majority's conclusion conflicts with the statutory text. Section 1252(g) applies to "any cause or claim" arising from the execution of removal orders. "Any" means "any." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–20, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). The statute bars all claims, even if they raise legal questions.

Contrast § 1252(g)'s categorical language with other parts of § 1252. After barring judicial review of the government's

discretionary decisions, § 1252 restores jurisdiction over "constitutional claims or questions of law" that are "raised upon a petition for review." 8 U.S.C. §§ 1252(a)(2)(B), (a)(2)(D). Outside the petition-for-review context, any exception for legal questions is conspicuously missing. "It would be easy enough" for Congress to exempt legal questions in § 1252(g), "just as Congress has" in other provisions within the same section. *See Nasrallah v. Barr*, 590 U.S. 573, 583, 140 S.Ct. 1683, 207 L.Ed.2d 111 (2020). But Congress did not, "and it is not the proper role of the courts to rewrite the laws." *Id.*

Without any textual support, the majority's special treatment for legal questions must rest, if at all, on an inference from Congress's silence. But Congress wasn't silent about the scope of § 1252(g). The statute bars "any" claim. Unlike nearby provisions, there's no exception for legal questions. Congress meant what Congress said, and that forecloses the majority's exception.

Even if the statute's scope were less clear, the majority's inference from silence would fall short. For one, the inference presumes that Congress's silent intent matters. Yet as judges, we enforce the written law—not unexpressed intentions. *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642–43, 142 S.Ct. 2486, 213 L.Ed.2d 847 (2022).

For another, silence supports conflicting inferences. *See United States v. Vonn*, 535 U.S. 55, 65–66, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). The majority assumes that because Congress didn't specifically preclude review of legal questions in § 1252(g), it must have meant to authorize that review. It's more likely that because Congress didn't exempt legal questions from § 1252(g) (as it did elsewhere), it intended to bar them. The majority gives no reason for selecting the former inference and

shunning the latter. It invents an exception to a jurisdictional bar through pure judicial *ipse dixit.*

Nor is any explanation possible. Congress has rejected the majority's inference from silence. In *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the Supreme Court invoked the same inference that the majority relies on here. Because § 1252 didn't specifically mention habeas petitions, the Court reasoned that habeas petitions raising "pure question[s] of law" about "the legality of Executive detention" must be exempt from the statute. *Id.* at 298–300, 305, 121 S.Ct. 2271. In response, Congress amended § 1252—including subsection (g)—to reject the inference. 8 U.S.C. § 1252(g); *Nasrallah*, 590 U.S. at 580, 140 S.Ct. 1683. When the statute bars "any" claim, it bars "any" claim. There's no room for atextual exceptions.

### 2

The majority's exception also conflicts with Supreme Court precedent. In its seminal § 1252(g) case, the Court used § 1252(g) to bar constitutional claims raising legal questions. Plaintiffs challenged the constitutionality of an anti-communism statute and claimed that the government unconstitutionally sought to remove them because of their political beliefs. *AADC*, 525 U.S. at 473–74, 119 S.Ct. 936. Those constitutional claims, just like Ibarra-Perez's tort claims, raised pure questions of law. *See id.* at 487–92, 119 S.Ct. 936. And those legal questions, just as here, implicated the government's legal authority to conduct immigration proceedings. *See id.*

Even so, the Supreme Court held that § 1252(g) barred the claims.

We too have applied § 1252(g) to bar claims raising pure questions of law. *Rauda*, 55 F.4th at 777 ("allegedly unlawful decision" to remove an alien immediately); *Sissoko v. Rocha*, 509 F.3d 947, 948–50 (9th Cir. 2007) (legality of detention). These cases confirm that § 1252(g) does not depend "on the particular grounds raised by an alien for challenging" the execution of his removal order. *Demore v. Kim*, 538 U.S. 510, 537, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (O'Connor, J., concurring in part and in the judgment). And they foreclose the majority's attempt to exempt legal questions from § 1252(g).

With all this in mind, it's no surprise that the majority's holding is an outlier. Plaintiffs around the country have argued, just like the majority, that challenges to the government's removal authority are exempt from § 1252(g). Each circuit to resolve the question has rejected the argument. *See Tazu v. Att'y Gen.*, 975 F.3d 292, 298 (3d Cir. 2020);[1] *E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021); *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017); *Camarena*, 988 F.3d at 1272. For good reason. Ruling otherwise elevates a faulty inference from silence over statutory text and Court precedent.

Our sister circuits gave another reason for rejecting the majority's rule. The majority's rule "would gut § 1252(g)." *Tazu*, 975 F.3d at 298. "[A]ny petitioner challenging the execution of a removal order could characterize his or her claim as an attack on [the government's] 'legal authority' to

---

1. Compelled by circuit precedent, *Tazu* left open an exception for when the Immigration and Nationality Act "itself t[akes] away the Attorney General's authority." 975 F.3d at 298. Ibarra-Perez has made no such argument. Similarly, though the majority cites *Kong v. United States*, 62 F.4th 608, 617 (1st

Cir. 2023), for the proposition that § 1252(g) allows challenges to the "legality of [arrest and] detention," that holding is irrelevant. Ibarra-Perez challenges the execution of his removal order, not the validity of his arrest and detention.

execute the order." *E.F.L.*, 986 F.3d at 965. Suppose an alien disagrees with the IJ's decision to deny withholding of removal. Or argues that the agency wrongly discounted testimony showing that he's entitled to asylum. Or that the agency made the wrong factual findings when rejecting his claim for relief under the Convention Against Torture. Each claim is "premised on a lack of legal authority" to execute a removal order. Maj. at 998. And under the majority's theory, every such claim is exempt from § 1252(g). In other words, under the majority's theory, § 1252(g) means nothing.

**3**

Set aside the statutory text, Supreme Court precedent, and the wisdom of our sister circuits. The majority's rule still fails.

Section 1252(g) strips jurisdiction over "cause[s] or claim[s]." Thus, the issue is whether Ibarra-Perez's tort *claims* are the type of "cause or claim" that is barred. The majority doesn't answer that question. It identifies a single *question* presented by Ibarra-Perez's claims that is purely legal. Yet Ibarra-Perez's tort claims present many factual questions, which, under the majority's theory, are barred. Did government officials fail to act with reasonable prudence or intend to harm Ibarra-Perez? Did Ibarra-Perez suffer extreme emotional distress in Mexico? What are his damages? By focusing on one legal question and ignoring the many factual questions, the majority neglects to determine our jurisdiction over Ibarra-Perez's entire claims.

\*\*\*

Section 1252(g) means what it says. "[A]ny cause or claim," legal or otherwise, challenging the execution of removal orders is barred. At the very least, the statute must mean *something*. And under the majority's rule, it means nothing. Every

circuit has rejected the majority's proposed rule. The statutory text and Supreme Court precedent demand the opposite result.

**D**

The majority gives five reasons to ignore the statutory text, Court precedent, and out-of-circuit authority. Each argument fails.

**1**

First, the majority invokes a substantive canon. Citing a "presumption in favor of judicial review," the majority suggests that any "ambiguities" in § 1252(g) should be construed narrowly. Maj. at 995 (quotation omitted). *But see Biden v. Nebraska*, 600 U.S. 477, 508–09, 143 S.Ct. 2355, 216 L.Ed.2d 1063 (2023) (Barrett, J., concurring) (criticizing similar canons).

The majority, however, doesn't identify any ambiguity in § 1252(g). It provides no textual basis for concluding that legal questions are exempt from § 1252(g). Instead, the majority hangs its hat on an atextual exception to the statute's otherwise clear scope. The statute isn't ambiguous. The statute bars "any cause or claim" arising out of the execution of removal orders. 8 U.S.C. § 1252(g). That's the type of "clear statement in favor of limiting judicial review" that overcomes the presumption of judicial review. *Rauda*, 55 F.4th at 780 n.3.

**2**

The majority next resorts to statutory purpose. Citing Justice Scalia's majority opinion in *AADC*, the majority notes that § 1252(g) was designed to address a "particular evil": judicial restraints on prosecutorial discretion. Maj. at 996 (quoting *AADC*, 525 U.S. at 485 n.9, 119 S.Ct. 936).

Thus, the majority reasons that § 1252(g) applies only to claims that affect prosecutorial discretion. Because legal questions don't affect prosecutorial discretion, the majority concludes that they aren't barred by the statute.

This reasoning is ironic. The majority's purpose-based argument rests on a quote from Justice Scalia—perhaps the most vocal opponent of purposivism in living memory. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 16–17 (2012) ("If any interpretive method deserves to be labeled an ideological 'device' it is … purposivism."). Only the Ninth Circuit could find an endorsement for a purposivist interpretation from Justice Scalia.[2]

The majority's purpose-based argument fails on three additional levels. First, statutes "often go beyond the principal evil" they are meant to address. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As federal courts, we credit "the text of a law" over "purported legislative intentions." *Castro-Huerta*, 597 U.S. at 642, 142 S.Ct. 2486. What Congress "*meant* to say" cannot trump "what it *did* say." *Zuni Pub. Sch. Dist. v. Dep't of Educ.*, 550 U.S. 81, 119, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007) (Scalia, J., dissenting). Thus, while *AADC* cited the purpose of § 1252(g) to explain why the text said what it did, the Court ultimately enforced not the purpose, but "what § 1252(g) says." 525 U.S. at 482, 119 S.Ct. 936.

It's easy to see why. "Only the written word is the law." *Bostock v. Clayton County*, 590 U.S. 644, 653, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). The majority uses unwritten purpose to set aside statutory text. That mode of reasoning was common when courts invoked "reason"—or the natural law "written in men's hearts"—to set aside or narrowly construe statutory text. Thomas Aquinas, Summa Theologica Pt. I-II, Q.94, art. 6, s.c. (referencing 2 Corinth. 3:3); *id.* Q.96, art. 6, co.; *see, e.g., Holy Trinity Church v. United States*, 143 U.S. 457, 458–59, 470–71, 12 S.Ct. 511, 36 L.Ed. 226 (1892). That mode of reasoning has no place in our interpretive practice today.

Second, the majority's argument rests on a false premise. The majority assumes that judicial review of the government's removal authority doesn't impact prosecutorial discretion. Yet forcing the government to answer in court every time it removes an alien who thinks his removal unlawful would thwart the government's discretionary removal authority. By stripping jurisdiction over challenges to the government's legal authority to execute removal orders, § 1252(g) protects the government's discretion. So even if § 1252(g) were limited to actions addressing its "principal evil," the majority's legal-question exception is still wrong.

Third, the majority's argument rests on another false premise. The majority reasons that because § 1252(g) aims to protect discretionary decisions, the statute must not bar legal questions. This assumes a dichotomy between legal questions and challenges to discretionary decisions. There is no such dichotomy. A challenge to a discretionary decision may raise pure questions of law. The statute expressly recognizes that. 8 U.S.C. §§ 1252(a)(2)(B), (a)(2)(D) (discussing legal questions that challenge discretionary decisions). As does our precedent. *Rauda*, 55 F.4th at 777–78 (identifying a legal question that arose from a discretionary decision); *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc) (noting legal questions can form "the backdrop" for dis-

**2.** The majority cites other cases for the statute's purpose, but these rest on *AADC*.

cretionary decisions). Any distinction between legal questions and challenges to discretionary decisions is "illusory." *E.F.L.*, 986 F.3d at 965.

In the end, the majority's purpose-based argument is a nonstarter. Purpose can't control over unambiguous text, especially when the purpose-based argument relies on false premises. Rather than twisting to invent an exception for Ibarra-Perez, we should have enforced the written law.

### 3

Third, the majority suggests that its exception is based on precedent. Not so. Our precedent is best read consistent with the statutory text.

### a

Start with the case that the majority says is most directly on point, *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018) (per curiam). There, we stayed an alien's removal order while we resolved his petition for review. *Id.* at 799. The government removed him anyway. The alien sued, and we held that § 1252(g) didn't bar his suit. *Id.* at 800. His claims, we reasoned, arose "not from the execution of the removal order, but from the violation of our court's order." *Id.* Even if the claims related "tangentially" to the execution of a removal order, they challenged the "decision or action to violate a court order." *Id.* If those claims were barred, we couldn't enforce "*any* court order" connected with immigration proceedings. *Id.* at 801.

*Arce* is inapt. "[B]ut for the violation of the [court order in *Arce*]," § 1252(g) would

have barred the alien's claims. *Id.* at 800; *see also id.* at 801 (emphasizing the need to "enforce our orders"). The majority attempts to massage *Arce* to fit with this case, stating that Ibarra-Perez "brings nearly identical tort claims to those brought by" the plaintiff in *Arce*. Maj. at 998. Despite the underlying claims, however, *Arce* turned on the violation of a court order. Here, by contrast, the government didn't violate a court order when it deported Ibarra-Perez. So on its own terms, *Arce* is no help.

The majority's remaining cases are similarly unhelpful. The majority cites cases that follow Justice Scalia's observation about § 1252(g)'s purpose and note that the three actions listed in § 1252(g) (commencing proceedings, adjudicating cases, and executing removal orders) involve discretion. *E.g.*, *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119–21 (9th Cir. 2001); *Ali v. Ashcroft*, 346 F.3d 873, 878 (9th Cir. 2003), *vacated on reh'g, Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005);[3] *Hovsepian*, 359 F.3d at 1155. But the fact that the listed actions generally *involve* discretion doesn't mean that an action is covered by the statute *only if* it's discretionary. The execution of a removal order remains a "decision or action . . . [to] execute removal orders" even if it's nondiscretionary. *See* 8 U.S.C. § 1252(g). In any event, that the listed actions involve discretion does nothing to support the majority's rule that *legal* questions are exempt.

The majority also quotes restatements of our early § 1252(g) decisions. In those early decisions, the government asked us

---

**3.** The majority's citation to *Ali* is especially problematic since it was vacated. *Ali* also cuts against the majority. Before the opinion was withdrawn and in response to the government's arguments, *Ali* characterized the plaintiff's claim as raising "a purely legal question." 346 F.3d at 878. But *Ali* didn't rely

on that characterization to find § 1252(g) inapplicable. Instead, *Ali* rested on the (since superseded) ground that habeas petitions are exempt from § 1252(g). *Id.* at 879. By resting on an alternative ground, *Ali* suggests that the legal nature of the claim wasn't enough to render § 1252(g) inapplicable.

IBARRA-PEREZ v. U.S. **1009**
Cite as 154 F.4th 989 (9th Cir. 2025)

to extend § 1252(g) beyond its text. We declined, holding that § 1252(g) applies "only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings." *Cath. Soc. Servs.*, 232 F.3d at 1150; *Sulit v. Schiltgen*, 213 F.3d 449, 453 (9th Cir. 2000). And we emphasized that our decisions went "no further" than this textual holding. *Barahona-Gomez*, 236 F.3d 1121.

*Walters*, 145 F.3d at 1052, was the first of these cases. The parties agreed that the court had jurisdiction over the underlying claims but disputed whether § 1252(g) barred a portion of the requested relief. *Id.* at 1048, 1051–52. The government argued that § 1252(g) stripped jurisdiction over "any relief" that "interferes" with the execution of removal orders. *Id.* at 1052. We disagreed because the underlying claims "d[id] not arise from" the actions listed in § 1252(g). *Id.*; *see also* 8 U.S.C. § 1252(g) (focusing on the "cause or claim," not the remedy). The plaintiffs didn't challenge "the merits of the decision to execute removal orders," and their deportation was "a consequence," but "not the basis," for their claims. *Walters*, 145 F.3d at 1052. We thus described their claims as "general collateral challenges to unconstitutional practices and policies" and held that § 1252(g) did not apply. *Id.* (quotation omitted).

Over time, panels began to describe *Walters* and its progeny less carefully. One panel described *Walters* as holding that "constitutional challenges to deportation procedures" are exempt from § 1252(g). *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002).[4] Another suggested that we can consider "purely legal question[s]" that don't challenge the govern-

ment's "discretionary authority." *Hovsepian*, 359 F.3d at 1155.

In context, these restatements of circuit precedent are not as broad as they sound. Each case—both the early cases and the later cases that described them—is best read to go "no further" than limiting § 1252(g) to its text. *Barahona-Gomez*, 236 F.3d at 1121; *see also Arce*, 899 F.3d at 800 ("[H]is claims arise not from the execution of the removal order."); *Hovsepian*, 359 F.3d at 1155 ("[T]he gravamen of Hovsepian's claim does not arise from [the three listed actions].");*see also Cath. Soc. Servs.*, 232 F.3d at 1150 (similar). That is, each case holds that § 1252(g) "is simply not implicated" by every claim that is "tangentially" connected to immigration proceedings. *Arce*, 899 F.3d at 800–01. None of these cases hold—like the majority now—that claims within the statute's textual scope are exempt.

The majority interprets our restatements of circuit precedent as broadly as possible. That's an error. The majority makes our restatements of circuit precedent inconsistent with the very cases that they purport to describe. These early cases went "no further" than limiting § 1252(g) to its text. *Barahona-Gomez*, 236 F.3d at 1121. The majority also places our caselaw on a collision course with the statutory text, which applies to "any" claim, whether legal or constitutional. The majority's reading also conflicts with Supreme Court precedent, which has applied § 1252(g) to legal and constitutional claims. *AADC*, 525 U.S. at 487, 119 S.Ct. 936. We should read our precedent consistent with instructions from Congress and the Supreme Court rather than stretching it to violate both. The majority errs in choosing otherwise.

---

4. *Jimenez-Angeles* discussed *Walters* but is itself inapposite. *Jimenez-Angeles* arose on a petition for review—proceedings in which

Congress has authorized review of constitutional challenges. 291 F.3d at 598, 603; 8 U.S.C. § 1252(a)(2)(D).

b

Every time we've created an atextual exception to § 1252(g), we've been corrected. The majority courts reversal by repeating a mistake that's been cured before.

In our first published decision interpreting § 1252(g), we held that constitutional claims were exempt. *Am.-Arab Anti-Discrim. Comm. v. Reno*, 119 F.3d 1367, 1374 (9th Cir. 1997). Our reasoning then tracked the majority's reasoning now. If § 1252(g) barred constitutional claims, there would be "no other avenue[ ]" to review those claims. *Id.* Several judges dissented from the denial of rehearing en banc. *Am.-Arab Anti-Discrim. Comm. v. Reno*, 132 F.3d 531, 532 (9th Cir. 1997) (O'Scannlain, J., dissenting from denial of rehearing en banc). And the Supreme Court reversed, applying § 1252(g) to bar a constitutional claim. *AADC*, 525 U.S. at 476, 487, 119 S.Ct. 936. We were wrong to deem constitutional claims exempt from the statute.

Our next atextual exemption was superseded by Congress. At first, a three-judge panel correctly relied on § 1252(g) to dismiss a habeas claim. *Hose v. INS*, 141 F.3d 932, 935 (9th Cir. 1998). After we vacated that correct decision to rehear it en banc, *Hose v. INS*, 180 F.3d 992, 994 (9th Cir. 1999), panels began holding that habeas petitions were exempt from § 1252(g), *e.g.*, *Magana-Pizano v. INS*, 152 F.3d 1213, 1222 (9th Cir. 1998) (per curiam); *Ali*, 346 F.3d at 880. This time, the Supreme Court failed to correct us, holding that habeas claims were exempt from § 1252. *St. Cyr*, 533 U.S. at 310 n.33, 121 S.Ct. 2271. So Congress stepped in and amended § 1252 to correct the misunderstanding. *See Nasrallah*, 590 U.S. at 580, 140 S.Ct. 1683. The statute now repeats what was "utterly clear" before: Habeas claims aren't exempt. *See St. Cyr*, 533 U.S. at 326, 121 S.Ct. 2271 (Scalia, J., dissenting).

Later, a three-judge panel created an exception for *Bivens* claims. *Sissoko v. Rocha*, 412 F.3d 1021, 1031–32 (9th Cir. 2005). The panel there invoked the same substantive canon and purpose-based argument that the majority repeats here. *Id.* Fortunately, we didn't let our own error stand. After the government petitioned for rehearing en banc, we withdrew our opinion and replaced it with one that recognized that § 1252(g) bars constitutional tort claims. *Sissoko*, 509 F.3d at 947.

Apparently for the majority, three reversals aren't experience enough. By creating another atextual exception to § 1252(g), the majority repeats a mistake corrected before.

4

The majority also concludes that Ibarra-Perez's removal to Mexico was unlawful because his final order of removal did not list Mexico as an alternative country of removal on it. Maj. at 997. As discussed below, the majority incorrectly tips its hand at the merits in making this conclusion. The majority also too narrowly construes the plain text of § 1252(g).

The IJ's removal order *authorized* Ibarra-Perez's removal from the United States. The only restriction was that the government couldn't send him to Cuba. No order—either from the IJ or a court—prohibited the government executing that removal order to send him to Mexico. The government's decision to do so thus executed that removal order as ordinarily understood. Section 1252(g) therefore bars Ibarra-Perez's claims.

This conclusion flows naturally from both Supreme Court and Ninth Circuit precedent. The Supreme Court has explained that when "an alien applies for withholding-only relief, he does so as to a particular country." *Johnson*, 594 U.S. at 535–36, 141 S.Ct. 2271. If an immigration

judge grants withholding, the "removal order is not vacated or otherwise set aside," but "remains in full force." *Id.* at 536, 141 S.Ct. 2271. The government may execute the removal order "to remove the alien to any other country authorized by the statute." *Id.*; *see Huang v. Ashcroft*, 390 F.3d 1118, 1121 n.2 (9th Cir. 2004) ("[N]either withholding nor deferral of removal prevents the government from removing an alien to a third country other than the country to which removal was withheld or deferred").

When the government removes an alien to a country authorized under 8 U.S.C. § 1231 or another statute, it "executes" that removal order in a manner that falls under § 1252(g). Section 1252(g) in turn categorically strips this court from hearing claims like those Ibarra-Perez brings here outside the petition-for-review process. Such a reading comports with Supreme Court precedent, and indeed, what the text of § 1252(g) states. After all, Ibarra-Perez must be challenging *something*—and here the only plausible answer is a challenge to the execution of the order of removal entered against him. Instead, the majority adopts a tortured reading of § 1252(g) under which it has no clear answer to the question of what Ibarra-Perez is challenging in bringing this lawsuit.

### 5

Finally, the majority tries to reframe Ibarra-Perez's tort claims as a due process claim that § 1252(g) cannot strip from the federal courts. But Ibarra-Perez brings tort claims, not due process claims. And Ibarra-Perez's tort claims cannot lead to any further due process in his situation. So Ibarra-Perez is attempting to wring money damages out of the federal government. And Congress could (and did) strip the federal courts of jurisdiction to entertain that type of claim.

The majority cites four cases for the proposition that DHS must "notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported." *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *see Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004); *Hadera v. Gonzales*, 494 F.3d 1154, 1156–59 (9th Cir. 2007); *Dzyuba v. Mukasey*, 540 F.3d 955, 957 (9th Cir. 2008) (per curiam). Whatever these cases say about due process, none supports our jurisdiction over Ibarra-Perez's tort claims.

To the contrary, these cases prove my point: challenges to removal belong in the petition for review process and we lack jurisdiction of these claims. In each of them, a petitioner challenged removal to a third country on appeal within the petition for review process. *See Andriasian v. I.N.S.*, 180 F.3d at 1039–40 (petitioner appealed through normal immigration appeals to challenge destination of removal as improper); *Himri*, 378 F.3d at 938 (same); *Hadera*, 494 F.3d at 1155 (same); *Dzyuba*, 540 F.3d at 955 (same). Since these cases all arose within the petition for review process, § 1252(g) did not strip the federal courts of jurisdiction. By contrast, Ibarra-Perez brings tort claims to challenge the execution of his removal order outside the petition for review process, meaning § 1252(g) does strip our court of jurisdiction. To the extent Ibarra-Perez had a right to be notified that he would be deported to Mexico (which the majority concedes the INA does not provide but claims the due process clause does), the federal courts only had jurisdiction to entertain that argument within the petition for review process.

Rather than reach this conclusion, the majority opinion resorts to bizarre hyperbole as apparent scare tactics. It claims

that "[i]f § 1252(g) bars jurisdiction over removals occurring outside of removal proceedings, . . . ICE can send *anyone* to *any* country without *any* review." Maj. at 999.

That statement is false on many levels. ICE has no authority to send a *citizen* to any country. And its decision to send an *alien* to any country is bound by the petition for review process Congress provided. None of the provisions the majority cites authorize ICE to remove anyone to any country without review. Such a claim is patently absurd. Section 1252(g) only pertains to aliens with final orders of removal entered against them. And an alien can only have a final order of removal entered against him after an immigration judge has thoroughly reviewed that alien's claims (as with Ibarra-Perez). Indeed, even if the majority were correct that courts have jurisdiction over Ibarra-Perez's tort claims here, the relief would do nothing to rectify the majority's perceived harm. The FTCA only provides monetary damages, not injunctive relief. So the majority's hyperbole is not only false, but it rings hollow.

The majority also concludes that "Ibarra-Perez challenges ICE's separate and post-hearing decision to remove him to Mexico." Maj. at 1000.

The majority ignores, however, that ICE removed Ibarra-Perez under the final order of removal entered against him. The decision to send him to Mexico was a part of ICE executing that removal order, permitted under the INA—not a separate decision divorced from the order's execution. *See Johnson*, 594 U.S. at 536, 141 S.Ct. 2271. Withholding of removal does not "vacate[ ] or otherwise set aside" a final order of removal since *that order* "remains in full force." *Id.* "DHS retains the authority to remove the alien to any other country authorized by the statute," under that final order of removal. *Id.* ICE's decision to remove Ibarra-Perez to Mexico was a

choice made to execute the final order of removal entered against him. Even if such a decision were unlawful, § 1252(g) makes clear that we only have jurisdiction to hear such a claim and issue a remedy through the petition for review process.

The majority suggests that a motion to reopen removal proceedings could not have helped Ibarra-Perez. Maj. at 1000–01. This is nonsense. Ibarra-Perez obtained asylum. How? By moving to reopen, the very mechanism the majority says would not work. The majority even recognizes this. *See* Maj. at 994. If Ibarra-Perez did suffer an injury, it got cured through the petition for review process that the majority derides. In its excitement to curtail the INS from acting contrary to how the majority wants it to, the majority resorts to pounding square pegs in round holes. And its pegs don't fit.

Now Ibarra-Perez brings statutory tort claims outside of that petition for review process. His claims don't attempt to remedy the constitutional injury he allegedly suffered by allowing him back into the country through injunctive relief. Indeed, such relief is expressly barred by the FTCA. He instead seeks money damages.

Congress therefore was especially free to strip us of jurisdiction to hear his claims for monetary damages. The United States is "generally immune from suits seeking money damages," and it is "Congress's prerogative, not ours," to allow such money damage suits against the federal government. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48–49, 144 S.Ct. 457, 217 L.Ed.2d 361 (2024). Although the majority tries to frame Ibarra-Perez's claim in terms of constitutional injury, § 1252(g) divests us of jurisdiction to entertain Ibarra-Perez's tort claims for financial compensation.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007). And stripping the federal courts of jurisdiction to hear money damages claims challenging the execution of a removal order, easily falls within those bounds. The majority cites no case anywhere to the contrary. And for good reason. Congress had the authority to categorically prevent Ibarra-Perez from seeking money damages against the federal government. *See Kirtz*, 601 U.S. at 48–49, 144 S.Ct. 457. It therefore also had the power to prevent the federal courts from entertaining such claims outside the petition for review process and did so through § 1252(g). *See Patchak v. Zinke*, 583 U.S. 244, 252, 138 S.Ct. 897, 200 L.Ed.2d 92 (2018) ("Congress' greater power to create lower federal courts includes its less power to 'limit the jurisdiction of those Courts.'") (citation omitted).

The two cases the majority cites on this point, *Walters v. Reno*, 145 F.3d at 1052–53, and *Sulit v. Schiltgen*, 213 F.3d at 453, do not save it. Neither permits an FTCA claim to proceed when otherwise barred by § 1252(g). In *Walters*, plaintiffs "brought suit against the government on behalf of themselves and similarly situated noncitizens, seeking declaratory and injunctive relief on the ground that the administrative procedures used by the INS to obtain final orders under the document fraud provisions of the Immigration and Nationality Act ... violated their rights to procedural due process." *Walters*, 145 F.3d at 1036.

We upheld an injunction enjoining the future deportation of aliens receiving inadequate notice under those procedures. Section 1252(g) did not apply because the plaintiffs' claims did not arise from a challenge to the execution of a removal order, but brought "general collateral challenges

to unconstitutional practices and policies used by the agency." *Id* at 1052 (quotation omitted). And we only reached this conclusion because "if the plaintiffs prevail[ed] on their claims, they [would] not be entitled to any substantive benefits; rather, they [would] only be entitled to reopen their proceedings." *Id.*

When a plaintiff seeks a substantive benefit, such as money damages, such a challenge isn't collateral but a direct challenge to the execution of a removal order. *Id.* The majority cannot rely on *Walters*. *Walters* confirms that § 1252(g) divests us of jurisdiction over claims such as the one Ibarra-Perez brings here. *Id.*

*Sulit* also proves unavailing. In *Sulit* we held that § 1252(g) did not strip us of jurisdiction over a due process claim where plaintiffs alleged the INS seized their green cards "without providing a rescission hearing pursuant to 8 U.S.C. § 1256." 213 F.3d at 453. *Sulit* did not involve a challenge to the execution of a removal order, which would have been barred under § 1252(g), but a challenge to the rescission of green cards. *Id.* The case does not support the proposition that a plaintiff can bring tort claims to challenge the execution of his removal order and disguise those claims as due process challenges to extract money from the government.

The majority attempts to reframe this case as one about curing an alleged due process injury. But Ibarra-Perez's claims cannot cure such an injury, as injunctive relief would. Ibarra-Perez was already able to reenter the United States and has received asylum through the statutory petition for review process. In that sense, the system worked just fine for Ibarra-Perez, as Congress provided. He can only win money damages from the United States beyond that if Congress authorizes him to bring such a claim. And here Congress

**1014**            **154 FEDERAL REPORTER, 4th SERIES**

affirmatively barred him from doing so through § 1252(g).

\*\*\*

Ibarra-Perez challenges the execution of his removal order, so § 1252(g) strips our jurisdiction over his claims. The majority invents an exception for legal questions that cannot be squared with the statutory text, conflicts with Supreme Court precedent, creates a circuit split, and guts the jurisdictional bar.

### III

If § 1252(g) doesn't bar Ibarra-Perez's claims, § 1252(b)(9) does. That section prohibits review of "all questions of law and fact" that arise from removal proceedings outside the petition-for-review process. This provision is "breathtaking in scope," *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (internal quotation marks omitted), and covers "all claims arising from deportation proceedings," *AADC*, 525 U.S. at 482–83, 119 S.Ct. 936. It bars challenges to "the process" through which removability is "determined." *Jennings*, 583 U.S. at 294, 138 S.Ct. 830; *see also id.* at 317, 138 S.Ct. 830 (Thomas, J., concurring in part and concurring in the judgment).

According to the majority, the provision doesn't apply because Ibarra-Perez doesn't contest the validity of his removal proceedings or removal order. Maj. at 997, 999–1000. That argument is refuted by the rest of the majority opinion. Throughout, the majority recognizes that Ibarra-Perez challenges the "procedures" (or lack thereof) leading to his removal. *Id.* at 1000–01. Section 1252(b)(9) bars such claims. *Jennings*, 583 U.S. at 294, 138 S.Ct. 830.

In arguing otherwise, the majority backs itself into a dilemma. If Ibarra-Perez challenges the government's failure to provide adequate process before removing him, § 1252(b)(9) bars his claim. If he instead

takes the process as given and challenges the execution of his removal order, § 1252(g) bars his claim. There's no way out of this dilemma.

As Ibarra-Perez and the majority face each horn of the dilemma, they make concessions that run headfirst into the other. Trying to avoid § 1252(g), the majority focuses on the procedures leading up to Ibarra-Perez's removal. Of course, that runs headlong into § 1252(b)(9). Then, trying to avoid § 1252(b)(9), the majority changes its tune and says that the claims have nothing to do with the validity of his removal order or removal proceedings. Maj. at 999–1000. But if that's true, then the only thing left for Ibarra-Perez to challenge is the execution of his removal order, which § 1252(g) forbids. The majority can't have it both ways. And either way, we lack jurisdiction over Ibarra-Perez's claims.

The majority attempts to sidestep this issue by pointing to a footnote in the government's brief which states that Ibarra-Perez has disclaimed any challenge to the prior removal proceeding. The majority states that it agrees with the government and thus won't find § 1252(b)(9) applicable here. Maj. at 999–1000.

This sleight of hand gives the game away. If the majority concedes that Ibarra-Perez isn't bringing a challenge to his prior removal proceeding, a challenge barred under § 1252(b)(9), then it is tacitly admitting that he brings a challenge to the execution of his removal order—the only thing he could otherwise challenge. That challenge, in turn, is barred by § 1252(g). No matter how the majority attempts to rationalize its conclusion, the self-evident structure of § 1252, when applied here, demonstrates that we lack jurisdiction.

### IV

Jurisdiction is the only question on appeal. Yet the majority tips its hand on the

merits, so I address the merits too. Ibarra-Perez argues that a statute, two regulations, and due process required notice that he could be sent to Mexico. The majority similarly suggests that because Ibarra-Perez's removal order did not designate Mexico, his removal was unlawful. Maj. at 1000. Each argument fails. The government was not required to notify Ibarra-Perez that he could be removed to Mexico before entering a removal order and sending him to Mexico. In any event, these merits arguments confirm that Ibarra-Perez's claims are barred by § 1252(g).

## A

Start with Ibarra-Perez's statutory argument. After an alien is ordered removed, 8 U.S.C. § 1231 determines where to send the alien. The statute creates two procedural tracks. The first, § 1231(b)(1), is for aliens placed in removal proceedings "immediately upon their arrival at the border." *Jama v. ICE*, 543 U.S. 335, 705 n.11, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) (citing 8 U.S.C. §§ 1231(b)(1)(A), (c)(1)). These aliens are generally sent to the country from which they traveled, but they may also be sent to a country willing to receive them or where they have citizenship or residence. 8 U.S.C. § 1231(b)(1)(C). The statute does not give these aliens any say in designating the country of removal. Nor does it require notice of that country.

The second track, § 1231(b)(2), applies to aliens removed after being "allowed into the country," such as through a visa. *Jama*, 543 U.S. at 705 n.11, 125 S.Ct. 694. Aliens on this track have a statutory right to designate where they'd like to be sent. 8 U.S.C. § 1231(b)(2)(A). The government must honor the alien's preference, unless an exception applies. *Id.* If an exception applies, the statute lists categories of countries where the alien may be sent. *Id.* § 1231(b)(2)(C)–(E). The statute itself

doesn't require notice of the alternative countries.

Both tracks carry a caveat. The government may not send an alien to a country where he is likely to be persecuted based on a protected characteristic. *Id.* § 1231(b)(3). This restriction is "withholding of removal."

All these provisions come into play only after an alien has been "ordered removed." *Id.* § 1231(a). In fact, the BIA prohibits IJs from addressing withholding of removal before ordering removal. *Matter of I-S-& C-S-*, 24 I. & N. Dec. 432, 434 (BIA 2008). That makes sense. Withholding of removal is country-specific relief. *Johnson*, 594 U.S. at 536, 141 S.Ct. 2271. It prohibits removal "to" a particular country but does not prevent removal "from the United States." *Id.* (emphasis omitted). Thus, withholding has "nothing to do" with the government's "legal authority" to remove an alien. *Id.* at 545–46, 141 S.Ct. 2271; *see also Nasrallah*, 590 U.S. at 583, 140 S.Ct. 1683 (country-specific relief "does not affect the validity of the final order of removal"). So while a removal order determines *whether* an alien may be removed, it need not identify *where* the alien will be sent. *See* 8 U.S.C. § 1101(a)(47)(A); *see also Johnson*, 594 U.S. at 539, 141 S.Ct. 2271.

Ibarra-Perez was never allowed into the United States and was placed in removal proceedings at a port of entry. He thus faced the first, less onerous track of designation procedures. *See* 8 U.S.C. § 1231(b)(1); *Matter of A-S-M-*, 28 I. & N. Dec. 282, 284 n.1 (BIA 2021). He had no right to designate a country of removal. The statute authorized his removal to Mexico, a country willing to accept him and where he had a visa. *Id.* §§ 1231(b)(1)(C)(iii), (iv); *see also* 8 C.F.R. § 241.25(d). And the statute did not require the government to notify Ibarra-Perez that Mexico was an option.

Because the applicable designation provisions don't require notice of the country of removal, Ibarra-Perez focuses on the withholding-of-removal provision, which he says creates a notice requirement not found elsewhere in the statute. But the withholding provision doesn't say anything about notice, either. *See* 8 U.S.C. § 1231(b)(3). Nor does it say anything about how to designate countries of removal. *See id.* The withholding provision takes the designation process (defined elsewhere in the statute) as given and carves out an exception to the list of possible countries. *Id.* It doesn't silently rewrite the designation process to create a notice requirement. *See Jama*, 543 U.S. at 341, 125 S.Ct. 694. Nothing in the statute required the government to notify Ibarra-Perez that he could be sent to Mexico.

### B

The majority makes a related argument. The majority suggests that a removal order isn't enforceable unless it designates a valid country of removal. Removal orders that don't designate a valid country can be challenged based on a separate decision of where to send an alien. Maj. at 999.

The Supreme Court has said otherwise. "[T]he finality of the order of removal does not depend in any way on the outcome of [withholding] proceedings." *Johnson*, 594 U.S. at 539, 141 S.Ct. 2271; *see also Nasrallah*, 590 U.S. at 582, 140 S.Ct. 1683. So has Congress. Congress defines a final removal order as one "concluding that the alien is deportable or ordering deportation." 8 U.S.C. § 1101(a)(47)(A); *Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 145 S. Ct. 1232, 1240, 221 L.Ed.2d 609 (2025) (noting a final removal order is one "specifying that the government may remove [the alien]"). A removal order meets these criteria and is final even if it doesn't designate a country of removal. Again, under

the statute, the government determines where to send an alien only after the alien is "ordered removed." 8 U.S.C. § 1231(a); *Matter of I-S- & C-S-*, 24 I. & N. Dec. at 434.

Thus, the majority errs in suggesting that Ibarra-Perez's removal order was incomplete since it didn't designate Mexico. Determining where to send Ibarra-Perez has "nothing to do" with the finality or enforceability of the order allowing the government to remove him. *Johnson*, 594 U.S. at 545–46, 141 S.Ct. 2271; *see Nasrallah*, 590 U.S. at 582, 140 S.Ct. 1683. Once the IJ ordered Ibarra-Perez removed, the government could remove him. *See* 8 C.F.R. § 1240.12(d) (so indicating). No subsequent removal order designating Mexico was required.

### C

Ibarra-Perez next searches agency regulations for a notice requirement. He first cites 8 C.F.R. § 1240.10(f). This regulation requires IJs to "notify" certain aliens that they have a right to designate a country of removal. *Id.* The regulation also requires IJs to identify alternative countries for these aliens. *Id.*

This regulation, however, applies only to aliens in the second designation track, or those removed after being admitting into the United States. *Id.* Ibarra-Perez was not admitted into the United States. And "[w]ith respect to an arriving alien" like Ibarra-Perez, the regulation creates *no* notice requirement. *Id.* It merely observes that designation will occur "pursuant to" the statutory requirements. *Id.* As discussed, the statute doesn't require notice. *See supra* § IV.A.

Ibarra-Perez also cites 8 C.F.R. § 1240.12(d), which requires IJs to "identify a country, or countries in the alternative, to which the alien's removal may in

IBARRA-PEREZ v. U.S. 1017
Cite as 154 F.4th 989 (9th Cir. 2025)

the first instance be made." While this regulation requires IJs to identify *a* possible country of removal (here, Cuba), it doesn't require a list of *all* alternatives. Nor does it require IJs to list the specific country to which the alien is ultimately removed (here, Mexico). Indeed, the regulation says that if the government can't send the alien to the listed countries, the regulation "does not limit the authority of the [government] to remove the alien to any other country as permitted by" the statute. *Id.* While the "better practice" might be to notify the alien of all possible alternatives, "[t]he regulations, however, do not require it." *Matter of Sagasti*, 13 I. & N. Dec. 771, 773 (BIA 1971); *see also* 70 Fed. Reg. 661, 671 (2005) (noting alternatives "can be" designated but acknowledging that's not required).

## D

Finally, Ibarra-Perez suggests that due process required the government to designate Mexico before entering and enforcing his removal order.

The Fifth Amendment provides that no "person" may be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. V. Because deportation deprives persons of the rights "to stay and live and work in this land of freedom," due process attaches to removal proceedings. *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). These proceedings must comport with "essential standards of fairness." *Id.* Those standards include notice of, and opportunity to challenge, the grounds for removal.

These principles are important. Yet we should exercise caution before creating procedural hurdles for our coequal branches. Too often, when courts pick up the due process hammer, everything becomes a nail. Caution is especially important in immigration law. "[O]ver no conceivable sub-

ject is the legislative power of Congress more complete." *Reno v. Flores*, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quotation omitted).

Ibarra-Perez invites us to throw caution to the wind. Ibarra-Perez could have challenged whether he could be removed from the United States and failed in doing so. But he demands another opportunity to challenge the government's decision to send him to Mexico over alternative destinations.

Due process guarantees no such opportunity. Due process attaches only to the deprivation of life, liberty, or property. *Paul v. Davis*, 424 U.S. 693, 700–01, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Kerry v. Din*, 576 U.S. 86, 90–92, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) (plurality op.). While removal *from* the United States implicates a liberty interest, *Bridges*, 326 U.S. at 154, 65 S.Ct. 1443; *Kerry*, 576 U.S. at 91, 135 S.Ct. 2128, being sent *to* Mexico does not. Ibarra-Perez prefers to be sent to Spain or Canada rather than Mexico, but that preference is not "life," "liberty," or "property" as those phrases were originally understood. *See Kerry*, 576 U.S. at 91–92, 135 S.Ct. 2128 (canvassing the original meaning). Nor does any statute or regulation grant Ibarra-Perez a liberty interest in being sent somewhere other than Mexico. *See id.* at 98, 135 S.Ct. 2128; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). An IJ ordered Ibarra-Perez removed, and the applicable regulations and statute authorized removal to Mexico.

Thus, while due process required the "essential standards of fairness" in determining *whether* Ibarra-Perez could be removed from the United States, due process said nothing about how the government should have determined *where* to send Ibarra-Perez. *See Yamataya v.*

*Fisher*, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (recognizing only a due process right to be heard on "the questions involving [the] right to be and remain in the United States"). Without an interest in being sent to Spain or Canada, Ibarra-Perez had no constitutional right to notice, or an opportunity to dispute, that he would be sent to Mexico instead.[5]

Perhaps that feels harsh. Four responses. First, federal judges aren't empowered to rectify everything that appears unfair. Deportation to Mexico is neither "a criminal proceeding" nor "punishment," and "[n]o judicial review is guaranteed by the Constitution." *Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547 (1952).

Second, aliens need not wait for a list of possible countries of removal before identifying where they fear persecution. Aliens should know the countries in which they fear persecution. Generally, the list of such countries will be short. It's not asking much to require aliens to identify those countries on their own.

Third, if process were required, Ibarra-Perez would at most be entitled to an opportunity to seek withholding of removal. And he lacks a meritorious withholding claim. Ibarra-Perez claims that before coming to the United States, Mexican officials required him to pay fees to stay in Mexico. After being removed to Mexico, three men demanded that he act as a drug mule or hand over a fee. At no point does Ibarra-Perez claim that he was physically harmed or subject to a pattern of serious mistreatment. *See Sharma v. Garland*, 9 F.4th 1052, 1061 (9th Cir. 2021). Under our precedent, Ibarra-Perez's vague and unrelated allegations fall short of the "extreme concept" of persecution, which is required for withholding of removal. *See id.* at 1062. So even if process were required, Ibarra-Perez has no basis to oppose removal to Mexico.

Fourth, Ibarra-Perez received the process that would have been required. He told the IJ that he feared persecution in Mexico, and nothing prevented him from building that argument out. If the IJ rejected his argument, Ibarra-Perez could have appealed to the BIA. If unsuccessful before the BIA, he could have petitioned for our review. And finally, if those were inadequate opportunities to establish persecution in Mexico, Ibarra-Perez could have moved to reopen his removal proceedings to introduce evidence of persecution in Mexico. *See* 70 Fed. Reg. at 671. The government has suggested that it may agree to reopen proceedings when aliens lack notice of the country of removal. *Id.* In short, Ibarra-Perez had adequate opportunity to litigate his alleged persecution in Mexico and failed to use that opportunity.

## E

This merits discussion confirms that Ibarra-Perez's claims are barred by § 1252(g). Under the majority opinion and on remand, Ibarra-Perez's claims will proceed towards a merits resolution. But the district court can't address the merits without reviewing the validity of Ibarra-Perez's removal order and the "process by which" his order was entered—which Congress prohibits courts from addressing

---

**5.** *Andriasian v. INS*, 180 F.3d 1033, 1041–42 (9th Cir. 1999), is not to the contrary. There, an IJ denied asylum because the petitioner failed to show persecution in Armenia—a country the petitioner "had no reason to anticipate would be a subject of the asylum hearing." *Id.* In dicta, we opined that it was arbitrary to deny asylum based on "an applicant's inadequate presentation of evidence" on an unforeseeable matter. *Id.* Ibarra-Perez's asylum claim wasn't denied on arbitrary grounds.

outside the petition for review. *See Jennings*, 583 U.S. at 294, 138 S.Ct. 830. To determine whether the government violated a regulation by failing to designate Mexico, the district court must consider which track of designation procedures applies to Ibarra-Perez and whether the government complied with those procedures. To determine whether the government violated due process, the court must analyze Ibarra-Perez's removal proceedings, verify whether Ibarra-Perez had a fair opportunity to seek withholding from Mexico, and determine whether Ibarra-Perez had a meritorious withholding claim. *See Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 926–27 (9th Cir. 2007). These questions are routinely raised on petitions for review. *Id.*; *Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004). And Congress has prohibited courts from reviewing these questions outside the petition for review. *See* 8 U.S.C. § 1252(a)(5); *Jennings*, 583 U.S. at 294, 138 S.Ct. 830. This confirms that Ibarra-Perez's claims are the type barred by § 1252(g).

V

Ibarra-Perez had a final and valid removal order. He claims the government was wrong to execute that order. Congress has precluded us from exercising jurisdiction over such claims. In any event, Ibarra-Perez is wrong that the government removed him unlawfully. Because the majority finds jurisdiction and allows this case to proceed, I dissent.



Vinod SODHA; Amee Sodha,
**Plaintiffs - Appellants,**

v.

**Philip GOLUBOWSKI, individually and on behalf of all others similarly situated, Appellee,**

Robinhood Markets, Inc.; Baiju Bhatt; Jan Hammer; Vladimir Tenev; Jason Warnick; Paula Loop; Scott Sandell; Robert Zoellick; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Barclays Capital, Inc.; Wells Fargo Securities, LLC; Mizuho Securities USA LLC; KeyBanc Capital Markets Inc.; Piper Sandler & Co.; Rosenblatt Securities Inc.; BMO Capital Markets Corp.; BTIG, LLC; Santander Investment Securities Inc.; Academy Securities, Inc.; Loop Capital Markets LLC; Samuel A. Ramirez & Company, Inc. Siebert, Cisneros, Shank & Co., L.L.C., **Defendants - Appellees.**

No. 24-1036

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted January 15,
2025 Pasadena, California

Filed August 29, 2025

**Background:** Investors brought putative class action against online brokerage firm, its officers and directors, and underwriters of its initial public offering (IPO) for alleged omissions in registration statement and prospectus and for control-person liability under Securities Act of 1933. Defendants moved to dismiss for failure to state a claim. The United States District Court for the Northern District of California, Edward M. Chen, J., 2024 WL 269507, granted motion. Investors appealed.

**Holdings:** The Court of Appeals, M. Smith, Circuit Judge, held that:

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 24-631

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P.
32(a)(4)-(6) and **contains the following number of words:** 4,168 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Bryan S. Beier **Date** 3/12/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11** *Rev. 12/01/24*